**WESTERN ELECTRIC COMPANY, INC.**

v.

**The UNITED STATES.**

No. 23–75.

United States Court of Claims.

Oct. 19, 1977.

Ralph A. Muoio, Washington, D. C., attorney of record for plaintiff. Mortimer M. Caplin, Ronald B. Lewis, Caplin & Drysdale, and E. R. Charvat, Washington, D. C., of counsel.

Donald H. Olson, Washington, D. C., with whom was Acting Asst. Atty. Gen. James D. O'Brien, Washington, D. C., for defendant. James L. Malone, III, Washington, D. C., of counsel.

Before COWEN and DURFEE, Senior Judges, and DAVIS, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## OPINION

COWEN, Senior Judge:

Plaintiff brought this action to recover the sum of $28,069.31, plus statutory interest, for Federal excise taxes assessed against and paid by it for the period from April 1, 1971 through October 31, 1971.

During the taxable period, plaintiff subscribed to Centrex telephone service furnished by the Illinois Bell Telephone Company. The basic Centrex service to which taxpayer subscribed included local service (referred to herein as local exchange service) over the lines of the Illinois Bell Telephone Company, and a private communications service which entitled the taxpayer to the use of the intercommunications system for its own telephones. There is no dispute on the excise tax status of such service during the period in issue, during which time the charge for the basic intercommunications system was not billed separately from that provided for the local exchange service. In addition and in connection with its Centrex service, plaintiff subscribed to

certain associated services, including switchboards, extension telephones, multi-button telephones, and others, which were appropriate and useful to the private intercommunication service. Plaintiff paid separate charges under the applicable tariffs for each of these associated services. The question for decision is whether the amounts paid for the associated services are subject to the Federal communications excise tax imposed by the Excise Tax Reduction Act of 1965, Pub.L. 89–44, 79 Stat. 136.

This case comes before the court on a stipulation filed by the parties. For the reasons set forth below, we find that plaintiff is entitled to recover, and we enter judgment in its favor for the amount claimed.

Plaintiff is a New York corporation engaged in the manufacture and sale of communication equipment to the Bell System companies. Although it has manufacturing, service, office and warehouse locations throughout the country, the operation involved in this suit is the Hawthorne Works, plaintiff's oldest and largest manufacturing plant, located in Chicago, Illinois. Plaintiff brings this action not as a producer but as a consumer (subscriber) of telephone communications services at the Hawthorne plant. Even though it is a subsidiary of the American Telephone and Telegraph Company (AT&T) and a part of the Bell System, it must pay the same rates for telephone service as do all other subscribers. It is charged according to "tariffs" filed with and approved by the Illinois Commerce Commission, and imposed by the Illinois Bell Telephone Company (Illinois Bell).

As a subscriber of telephone services, Western Electric must pay a Federal excise tax upon certain of the communications services it uses. This tax, first enacted in 1941 as a wartime revenue measure,[1] was amended by the Excise Tax Reduction Act of 1965,[2] and is now codified as 26 U.S.C. §§ 4251, et seq. The tax is imposed upon "local telephone" and other services.[3] However, the tax is specifically not applicable to "private communications services," (commonly known as "intercoms"), as defined in the Code, when those services are furnished either by telephone companies as part of their regular services, or are sold outright to consumers by communications companies. Hereafter, the latter will be referred to as "subscriber-owned."

The equipment which is commonly available in connection with an intercom is not limited to the basic communication service, but includes a number of "associated services" which make the operation of the intercom more flexible and convenient. Plaintiff, which had over 4,000 telephones in its Hawthorne plant, utilized a wide variety of these associated services in its operations. The associated services may be grouped into four general categories:

1. *Consoles.* These are desktop switchboards through which an attendant may answer calls to the subscriber's main number, transfer incoming calls from one station to another, and control internal calls from one telephone to another. These consoles are also referred to as "attendant positions."

2. *Key Set Telephones.* These permit communication over more than one line; they contain a "key set" consisting of five station buttons and one hold button which light up or blink when in use.

3. *Call Director Sets.* Essentially expanded versions of key sets, these instruments are normally used by secretaries or other personnel who need more than six lines.

4. *Other.* This catch-all category includes a number of different items such as extension telephones, speakerphones (which permit "hands-free" operation), special "hold" capabilities and, for some areas of plaintiff's plant, telephones especially constructed for use around explosives.

1. Revenue Act of 1941, Pub.L. 77–250, 55 Stat. 687.

2. Pub.L. 89–44, 79 Stat. 136.

3. Other services include "toll telephone services" and "teletypewriter exchange service." Any service which does not fall within one of these three categories is not taxed. *See* the full text of the statute, reproduced *infra.*

Plaintiff obtained the use of this equipment not through outright purchase, but upon subscription to what is known as the Centrex system of business telephones. Centrex is a system which permits both local exchange access and intercom services over the same line. The subscriber may place and receive outside calls directly, without resort to an on-the-premises attendant operator, or he may use the operator where necessary. If he desires to make an intercom call, he dials a four-digit number which connects him directly to the other intercom station, obviating reliance upon a switchboard or upon the local exchange network. The attendant position may also be used, however, in circumstances where an outside caller wishes to contact the business generally or does not know the particular office number desired.

Under the Centrex system the subscriber was, at the time period now in suit, charged with a single basic service charge for both local exchange and basic intercom services.[4] This was necessary because the Illinois Bell Telephone Company could not separate its Centrex line tariff into a charge for exchange access and another for basic intercommunication service except upon application to and approval by the Illinois Commerce Commission. This unified or "bundled" charge did not include a charge for the "associated services," however. Plaintiff and other subscribers were billed separately for each associated service according to the extent of each service's use. For plaintiff's Hawthorne plant during the period in dispute, plaintiff was billed $175 per month for each of three consoles it used, $12 each for monthly use of between nine and 29 call director sets, and $1,377.50 for use of 551 key sets.

Centrex was not the only system provided by telephone companies for simultaneous intercom-local exchange service. Illinois Bell had other Private Branch Exchange Systems (PBX) which provided slightly different service. In these other PBX systems there are a number of "trunk" lines which connect the local exchange to switching equipment on the premises. During the taxable period, a subscriber to PBX from Illinois Bell would be billed on the basis of three separate tariffs on file with the Illinois Commerce Commission. First, there was a tariff charge provided by each of the trunk lines that gave access to the subscriber's telephone system with a PBX service; secondly, there was a tariff charge for each of the services provided by PBX switching equipment, station line connections and stations (which provide PBX private communication service over lines referred to hereinafter as "PBX station lines") and thirdly, there was a separate tariff charge for each of the associated services previously described.

Throughout the taxable year involved here, PBX stations were not allowed to receive or place calls directly to outside lines, but had to route calls (both incoming and outgoing) through a central operator on the premises. This has since been modified, so that PBX is now functioning essentially the same as Centrex in its method of placing calls. The only significant difference between Centrex and PBX for purposes of this controversy is that under the PBX system, separate charges are made for intercom, local exchange, and associated services, while the Centrex system has separate charges only for the associated services and the unified local exchange and intercom service.

During the period pertinent to this suit, a business which desired an intercom service was not limited to a choice between Centrex and PBX systems provided by a telephone company. The subscriber could also purchase intercom equipment outright from a communications equipment manufacturer, and the equipment was functionally equivalent to that offered by telephone companies. Prior to January 1, 1969, only railroads, electric power companies, and pipeline companies were permitted to interconnect the

---

4. Tariffs were modified by the Illinois Commerce Commission in 1971 (a few months after the period in dispute) to permit "unbundling" or separation of intercom and local exchange service within the basic Centrex service charge.

subscriber-owner equipment, to the local exchange service. Thereafter, the telephone company tariffs permitted all subscribers to interconnect certain subscriber-owned equipment, so that all subscribers had access to the same service as those having PBX and Centrex systems. The equipment which was available for purchase was every bit as sophisticated and varied as that available upon subscription to a telephone company. Subscriber-owned equipment may have appeared less inviting than Centrex or PBX service in that it had to be purchased, rather than rented for a monthly phone bill. But the purchaser of the equipment enjoyed a distinct and important advantage over the Centrex or PBX subscriber—his equipment was free of the Federal excise tax.

It was in order to correct the competitive imbalance existing between telephone company-furnished services and subscriber-owned equipment that Congress passed section 4252 of the Internal Revenue Code of 1954, as amended. That much, at least, is clear from a reading of the House and Senate Committee reports accompanying the passage of the Act:

> * * * The telephone companies presently are losing intrapremise business (and interpremise business within local areas) to those providing telephone and microwave equipment which can be purchased and operated by the users themselves. Installation of equipment in this manner is accompanied by a reduction in the service from the local telephone company. Businesses installing their own internal communications system in this manner avoid the tax on the telephone company's charge for both equipment and services. With the ever-increasing number of varied services which modern science makes it possible for telephone companies to provide, the tax on private communication systems represents a severe competitive handicap to the expanded use of these new and varied services. [H.R.

Rep.No.433, 89th Cong., 1st Sess., *reprinted in* 1965 *U.S.Code Cong. & Admin. News,* p. 1677.]

The immediate effect of the 1965 Excise Tax Reduction Act was to eliminate the tax upon "private communication service" as defined in the Act, when the service is provided by telephone companies in connection with their regular service. However, the precise extent of the tax exemption has not been clarified. In the belief that the associated services had been exempted from tax, Illinois Bell did not bill or collect from plaintiff any excise tax upon the "associated services" used in connection with either Centrex or PBX services. Similarly, the telephone company did not collect any tax upon that part of PBX systems which was separately billed for service provided by the "PBX station lines." However, it did collect from plaintiff an excise tax on the amount billed for the unified exchange and basic intercom Centrex service.

Plaintiff has never contested the tax collected by Illinois Bell upon the unified, unbundled charges. The Government, for its part, has not contested the tax exemption allowed for "PBX station lines" service provided by the PBX switching equipment station line connections and stations, nor has it sought to tax PBX associated services until quite recently.[5] As previously indicated, the dispute to be resolved in this action is the taxability of the associated services used in connection with Centrex systems. On June 1, 1974, the Internal Revenue Service (I.R.S. or Service) notified plaintiff that the Government would assess and collect an excise tax upon the Centrex associated services used by plaintiff for the taxable period April 1, 1971 through October 31, 1971. Plaintiff filed a timely claim for refund of the tax, but the I.R.S. denied the claim on December 20, 1974. Thereafter, plaintiff paid the tax and filed this suit for a refund.

5. As late as the filing of the stipulation of facts before the court, the I.R.S. field offices had "not been instructed to assert and [had] not asserted that the associated services provided in connection with PBX service * * * are subject to * * * tax." [Stip. No. 49.] This situation has changed with the publication of Rev.Rul. 77–189, discussed *infra.*

Although plaintiff brings this suit only on its own behalf and for a relatively small sum, we recognize that a final decision on the issues presented here may have a far broader impact than the taxability of the associated services used in plaintiff's Hawthorne plant. During the period from 1965 to 1973, there were as many as 2,500 subscribers to Centrex service in the United States. There are currently in audit or otherwise pending before the I.R.S., numerous cases involving the excise tax assessed against these subscribers for the use of their Centrex associated services. As of the date this suit was filed, those related cases were being held in suspense.

## I.

The system of taxation of telecommunication services established by 26 U.S.C. §§ 4251 *et seq.* is relatively straightforward. To be taxable, a service must be "local telephone service," "toll telephone service," or "teletypewriter exchange service." 26 U.S.C. § 4251(a). As far as plaintiff is concerned, its "associated services" must fall within the definition of "local telephone service" to be taxable. Plainly, its associated services are not covered by either of the remaining two categories.

"Local telephone service" is defined by 26 U.S.C. § 4252(a) as follows:

(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

(2) any facility or service provided in connection with a service described in paragraph (1).

The term "local telephone service" *does not include* any service which is a "toll telephone service" or a *"private communication service"* as defined in subsections (b) and (d). [Emphasis added.]

It is plaintiff's contention that the services upon which it has been taxed are "private communication services" and are therefore not subject to the excise tax imposed by section 4251. Section 4252(d) defines "private communication service" as:

(1) the communication service furnished to a subscriber which entitles the subscriber—

(A) to exclusive or priority use of any communication channel or groups of channels, or

(B) to the use of an intercommunication system for the subscriber's stations,

regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),

(2) switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and

(3) the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system, except that such term does not include any communication service unless a separate charge is made for such service.

It is conceded that the associated services subscribed and paid for by plaintiff are "private communication" services referred to in section 4252(a). However, in order to prevail here, plaintiff must meet two requirements of section 4252(d). First, plaintiff must show that it paid "a separate charge" for such associated services, and second, plaintiff must establish that the associated services are "necessary or unique to the use" of the private communication service. Each of these requirements will be separately discussed.

The "separate charge" issue has provided some confusion because of the shifting and contradictory positions defendant has assumed in the presentation of its case. The audit and assessment of the disputed taxes were based on the Government's contention that the "separate charge" requirement was not met, and much of plaintiff's moving brief was addressed to that question. How-

ever, it is undisputed that the plaintiff did in fact pay a separate charge for the associated services and in its brief, defendant conceded that plaintiff had, to that extent, qualified for the tax exemption authorized by section 4252(d). Defendant's brief stated:

> The associated services in issue were provided in connection with both "local telephone service" described in Section 4252(a)(1) and an internal "intercommunication system" described in Section 4252(d)(1). Those associated services thus meet the threshold definitional requirements of both Section 4252(a)(2) (taxable "local telephone service") and Section 4252(d)(2) (nontaxable "private communication service"). Moreover, *we agree with taxpayer that a separate charge was made for each of the associated services in issue as required by Section 4252(d).* * * * [Defendant's Brief, at p. 14, emphasis added.]

Relying on the quoted language, plaintiff in its reply brief naturally assumed that the separate charge issue had been removed from this case, but in oral argument, defendant apparently withdrew its concession and reasserted its reliance on revised Rev. Rul. 73–270, 1973–1, C.B. 444, which declared that the separate charge requirement was not met.[6] Since defendant's position on this question is unclear, we resolve the doubt by holding that there was a separate charge for the associated services within the meaning of section 4252(d).

Our conclusion is based on three factors: (1) the legislative history as embodied in the reports of the House and Senate Committees on the Excise Tax Reduction Act of 1965; (2) negotiations between representatives of the American Telephone and Telegraph Company and the staff of the Joint Committee on the Internal Revenue Taxation preceding the passage of the Act; and (3) the language of the statute itself.

■ Since both parties claim support from the legislative history we consider it first. The first portion of the Committee Reports describe the "severe competitive handicap" that the telephone companies were subjected to under existing law, because private communication services furnished by them were taxable, whereas functionally equivalent services provided by subscriber-owned equipment were not taxable. As previously stated herein, the principal objective of the 1965 Act was to eliminate this competitive disadvantage. With respect to the separate charge question, the Committee Reports read as follows:

> For the reasons indicated above, your committee's bill provides an exemption from the tax on local telephone service for private communications service if a separate charge is made for this service. It is understood that private lines and PBX systems generally will immediately qualify for this exemption. However, it is understood that Centrex systems— where the switching equipment is generally on the premises of the local exchange rather than on that of the subscriber— generally do not, as yet, provide for a charge which is separate and distinct from that for local telephone service. *Until such a separation is made, this exemption, therefore, will not apply in the case of Centrex service.* [H.R.Rep.No. 433, 89th Cong., 1st Sess., *reprinted in* 1965 *U.S.Code Cong. & Admin.News* p. 1677; emphasis added.]

Relying solely on the quoted language, the Government issued its Rev.Rul. 73–270 which held that the associated services were not exempt from tax even though they were charged separately, unless and until the basic Centrex service charge was broken down with separate billings for local exchange service and for the basic intercommunication system. The revenue ruling declared:

> * * * it is the intention of Congress that, when Centrex service with unre-

---

6. The defendant's position denying the exemption for failure to meet the "separate charge" requirement was originally set forth in Rev.Rul. 73–270, *infra.* In oral argument, defendant de-

clared: "The taxpayer insists all through its brief that we have conceded or abandoned the 1973 ruling. We have not conceded or abandoned the ruling; the ruling speaks for itself."

stricted stations is furnished to a subscriber, the charge for the entire service package is subject to the tax imposed on local telephone service by section 4251(a)(1) of the Code if there is not a separate charge for that part of the service furnished that represents private communication service.

In the instant case the charge for the Centrex service furnished is not broken down between local telephone service and private communications service. Thus, amounts paid for the Centrex service furnished must be considered as amounts paid for local telephone service, and all facilities and services furnished therewith must be considered as being provided in connection with local telephone service * * *. [Rev.Rul. 73–270, 1973–1, C.B. 444, 445.]

■ In our opinion, the ruling is unduly restrictive, misconstrues the legislative history, and reaches an erroneous result. We do not believe that it was intended by Congress that until separate charges are made for the local exchange service and for the basic intercommunication service, no Centrex service *"of any kind"* may be exempt. The reports state that "Centrex systems * * * *generally* do not, as yet provide for a charge which is separate and distinct from that for local telephone service," and that *"until such a separation is made,* this exemption, therefore, will not apply in the case of *Centrex service."* [H.R.Rep.No.433, *supra,* U.S.Code Cong. & Admin.News 1965, p. 1677, emphasis added.]

We think that this portion of the report refers only to the unified, bundled Centrex service charge and indicates that no part of this charge would be exempt from tax until the charge for the local exchange service was separated from the charge for the basic intercom service. No reference was made to the associated services provided by the telephone companies under the Centrex system, and since it was known that those charges had been separately billed, we think it follows logically that there was no Congressional intent to tax the separately billed associated services.

That this was the meaning of the statement contained in the Committee Reports becomes fairly clear upon examination of the background of section 4252. The background strongly indicates that the Congressional Committees understood that the associated services separately charged under the Centrex system would be tax exempt upon the passage of section 4252(d). Section 4252 resulted partly from a bill drafted by the American Telephone and Telegraph Company, known as "Draft A," and an Administration proposal. Draft A purported to establish the same nontaxable status for telephone-company furnished intercom service as had previously applied to subscriber-owned intercom equipment. Although Draft A provided that no tax would be imposed on any amount paid for private communication service if the service was used in the conduct of a trade or business, the significance of Draft A for our purposes is that it provided that the charge for the basic private communication service served by a local telephone system and connected with such local exchange service, would not be tax exempt unless a separate charge was paid for the intercom system, whereas no such requirement was contained in Draft A for the associated services used in connection with the basic intercom system. In this connection, it is to be remembered that at the time Draft A was submitted to the Joint Committee, the Centrex system to which plaintiff subscribed did not provide a charge for the local exchange service separate from that for the basic intercom system. However, there was a separate charge for the Centrex associated services. In the Fall of 1964 and prior to the passage of the 1965 Act, there was a meeting at which the staff of the Joint Committee requested the AT&T representatives to supply information as to the revenue loss that would be involved if the charges for Centrex service were separated into those for local telephone service and for private communication service, which would be exempt under the business use exemption proposed in Draft A. The general tax attorney for AT&T responded to that request by letter of December 17, 1964, addressed to the

Chief of the Staff of the Joint Committee and reading as follows:

The following are answers to the three questions with regard to Centrex service that you gave to Mr. R. J. Foulis, and which, for the purpose of clarifying our understanding of the questions, I discussed with you by telephone on December 8.

### 1.

In the first question you ask how much revenue loss we believe would be involved if the charges for Centrex service, as provided in current tariffs, could be separated so as to identify the part for local telephone service and the part for private communication service (which latter part would be exempt from tax under the business use exemption in Draft A).

The monthly charge for Centrex service is the total of separate charges for each attendant position, each unrestricted telephone station, and each restricted telephone station for which a customer subscribes. An attendant position is a switching arrangement, at which an attendant may redirect incoming calls to the unrestricted telephone stations and assist in the placing of toll calls. An unrestricted telephone station has access to the local telephone system and is entitled to local exchange service, as well as to intercommunication service with all other stations in the Centrex service. A restricted station provides only intercommunication service with the other Centrex stations. The charge per restricted station is less than the charge per unrestricted station, since the latter reflects the additional value of local exchange service.

Each of these charges varies in amount among the several telephone companies. Also, within each company the charge per unrestricted station varies in accordance with the total number of stations to which the Centrex customer subscribes (being somewhat lower for the larger systems than for the smaller). We think, however, that a reasonably accurate esti-

mate of current *average monthly* charges is: $125 per attendant position, $7.50 per unrestricted station and $3.50 per restricted station. (These average monthly charges are used in all discussion and tax estimates that follow.)

An estimate of the tax revenue that would be lost if Draft A were to be applied to Centrex requires analysis of each of these three charges separately, as follows:

The charge for an attendant position would be a charge for private communication service within the definitions of Draft A, and would be entitled to the business use exemption. Application of Draft A would exempt this charge *without change* in the Centrex tariffs currently in effect. * * *

The charge for a restricted telephone station would also constitute a charge for private communication service *without change* of current tariffs. * * *

Substantial tax revenue loss (in addition to the $123 million) would result only if the charge for an unrestricted station under tariffs currently in effect were to be separated into two charges, one specifically identifiable as the charge for the local exchange service privilege (taxable under Draft A), and the other for intercommunication service (subject to the business use exemption). * * *

* * * * * *

[Plaintiff's Exhibit 17, pp. 1–4; emphasis in original.]

The understanding regarding the proposed taxability of Centrex service as reflected in this letter is threefold: First, where the service is devoted exclusively to intercommunication (*i. e.*, a restricted station), it would be tax exempt without any change in the existing tariffs. Second, where the telephone company provided unrestricted Centrex service (both intercom and local exchange service) the service would be subject to the excise tax until the telephone company separated its tariff into one charge for the local exchange service and another for the basic private intercommunication service. Third, and to the point

on the question before us, the associated services provided by the Centrex system for which subscribers were already being charged separate rates, such as an "attendant position" (console switchboard), would be exempt from the tax without any change in the Centrex tariffs then in effect.

On the basis of this background information, we think it may reasonably be inferred that the Congressional Committees understood that the associated services provided under the Centrex system would be exempt from tax under the new law to be enacted, so long as a separate charge was paid for such service.

Our view of the intent of section 4252(d) is, we think, also clearly supported by the statutory language itself. It will be observed that section 4252(d) defines three types or categories of "private communication service." The first type is described in subsection (d)(1)(B) as the use of an intercommunication system for the subscriber's stations, regardless of whether the system may be connected through switching to "local telephone service." A second type of "private communication service" is separately defined in subsection (d)(2) as the several kinds of associated services which are in issue here. The third category is "channel mileage" covered by subsection (d)(3). The concluding clause in subsection (d) states that a "private communication service . . . does not include *any communication* service unless a separate charge is made" therefor. To us this language, particularly the use of the word "any," means that if a separate charge is made for "any" of the three categories, the separate charge requirement is met.

## II.

■ The principal issue in this case is raised by the Government's defense that the associated services to which plaintiff subscribed do not qualify for the tax exemption, because they are not "necessary or unique" to the "private communication service" defined in section 4252(d)(1). This is the only argument asserted by the defendant in its brief to the court. Defendant has stipulated that the associated services are appropriate and helpful in connection with the use of plaintiff's intercom system, and in its brief to us, defendant does not contend that an associated service must be used exclusively in connection with the intercommunication system to meet the "necessary or unique" requirement. Rather, it is defendant's position that to qualify for the exemption, the associated service must be *technologically* essential to the use of the intercommunication system referred to in section 4252(d)(1)(B).

Plaintiff concedes that the associated services are not "unique," but argues that they are "necessary" in that they are "appropriate and helpful" to the use of the intercommunication system.

Defendant's primary position in this litigation parallels that which is set forth in two revenue rulings, Rev.Rul. 74–590, 1974–2, C.B. 364 and Rev.Rul. 77–189, 1977–2, C.B. —— (May 31, 1977). In view of these rulings, we think it will be helpful to summarize the various positions taken by the Internal Revenue Service in revenue rulings on the taxability of the associated services. As previously stated, the I.R.S. had in 1973 in Rev.Rul. 73–270, held that associated services used in connection with a basic Centrex intercom system were taxable, because the unified charge for the Centrex service was not divided into separate charges for the intercom system and local exchange services. After the telephone companies responded to this holding by unbundling the charge for the Centrex service by breaking down the charges between local service and private communication service, another request was made for a ruling granting the tax exemption for the associated services. In Rev.Rul. 74–590, the taxpayers were again turned down, this time on the ground that the equipment was not "necessary or unique" to the use of the private communication system. This ruling contains no rationale which supports the conclusion stated.

The promulgation of Rev.Rul. 74–590 produced a curious and unbalanced situation. From the time that the charges for the

Centrex services were unbundled, all the private communication services were furnished under billing procedures which were virtually identical to those using PBX systems. In addition, the PBX systems provided the same kind of associated services as those provided in connection with the basic Centrex system. Yet, from the date of the passage of the Excise Tax Reduction Act of 1965, until one week before oral argument in this case, the I.R.S. had not collected excise taxes on charges paid for the PBX associated services. This, we feel, was the kind of unequal treatment which provoked Justice Frankfurter's remark that "the Commissioner cannot tax one and not tax another without some rational basis for the difference." *United States v. Kaiser*, 363 U.S. 299, 308, 80 S.Ct. 1204, 1210, 4 L.Ed.2d 1233 (1960), (Frankfurter, J., concurring).

In apparent recognition of the patent imbalance which had been created by these inconsistent rulings, the I.R.S. on May 31, 1977, issued Rev.Rul. 77–189. It was made in response to a request regarding the taxability of dual use accessorial equipment (associated services) used in connection with PBX systems. The ruling recognized that these associated services functioned in the same way and that the charges for their use were billed in the same manner as the Centrex associated services, which were held to be taxable in Rev.Rul. 74–590. The ruling stated that Rev.Rul. 74–590 applied equally to the associated services used in connection with the PBX system and with other similar types of systems which provided both local exchange service and private communication service. Apparently in view of the problem that would be created by applying the ruling retroactively to PBX services, it was stated that the new rule would not be applied with respect to bills rendered after June 18, 1973 (the date of publication of Rev.Rul. 73–270) and before April 1, 1975 (the second calendar quarter beginning after December 9, 1974, the date of publication of Rev.Rul. 74–590).

It is well settled that while revenue rulings may be helpful in interpreting a statute in some cases, they are not binding either on the courts or the Secretary of the Treasury. *Allstate Ins. Co. v. United States*, 530 F.2d 378, 209 Ct.Cl. 1 (1976), and cases cited therein. In this instance we decline to follow the rulings referred to herein, because we think that they constitute unreasonable and erroneous interpretations of the law.

The phrase "necessary or unique" was first included in a bill drafted by the Administration and submitted to Congress by the President.[7] There is nothing in the legislative history which explains the meaning and application of the phrase, so that it is necessary to look to other sources for its interpretation. Plaintiff suggests that the absence of legislative history indicates that the language chosen had a well settled usage which required no further explanation. To support that view, plaintiff calls our attention to court decisions interpreting section 162(a) of the Code, which permits deductions for "ordinary and necessary expenses" incurred in connection with a trade or a business. In several cases, the Supreme Court has interpreted the word "necessary" in section 162 as requiring only that the claimed expenses be appropriate and helpful. *Welch v. Helvering*, 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212 (1933), *Commissioner v. Tellier*, 383 U.S. 687, 689, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). In *Tellier*, the Court cited *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819), wherein the Supreme Court ruled that the "necessary and proper" clause in Article I of the Constitution does not limit Congress to the enactment of legislation found to be essential, but that the word "necessary" should be interpreted to include legislation which is "appropriate" to a legitimate legislative goal.

To buttress its interpretation of "necessary," defendant cites *Barton Mines Corp. v. Commissioner*, 446 F.2d 981, 991 (2d Cir.

**7.** The Administration proposal, with explanatory materials, has been printed as H.R.Doc.No. 173, 89th Cong., 1st Sess., 1965.

1971), which in construing section 613(c)(2) of the Code held that the word "necessary" means "essential or indispensable."

The different results reached by the courts in *Welch v. Helvering* and *Barton*, may be explained because of the different considerations underlying the provisions of the Code in each case. In *Barton*, the court was seeking to interpret section 613(c)(2) of the Code. It made precise distinctions as to activities which constituted "mining" eligible for a depletion allowance, in contrast to "refining," which was not eligible for such an allowance. In defining "mining," the statute included "[any] treatment process necessary or incidental thereto." Since it was found that the purpose of the statute was to make precise delineations, the court gave the term "necessary" a narrow interpretation. Moreover, this interpretation was in accord with a Treasury regulation which was promulgated after the case had been tried in the Tax Court.[8]

None of the cases cited by the parties is sufficiently analogous to settle the question, but on other grounds, we have concluded that plaintiff's interpretation more nearly reflects the Congressional intent.

In the first place, we think the adoption of defendant's interpretation of "necessary" would lead to absurd results and render section 4252(d)(2) meaningless. Defendant would tax the charges on all of the equipment provided as associated services if the private communication system could possibly function without the use of the equipment. This would be the result if, as defendant insists, the associated services must be technologically essential to the intercom system. Thus, under defendant's view, the associated services must be an integral part of the private communication systems which are already covered by section 4252(d)(1)(B). If that were true, there would have been no need for Congress to include subsection (d)(2), which defines the associated services.

Obviously, the word "necessary" must be interpreted in its particular context; it must be read in connection with the other provisions of section 4252 and particularly 4252(d)(1)(B), and it must be construed in accordance with results which Congress sought to achieve when the 1965 Act was passed. When this is done, there are persuasive indications that plaintiff's interpretation is correct. For example, extension lines are expressly mentioned in subsection (d)(2) as the kind of associated services which Congress intended to qualify for the exemption. Clearly, extension lines are not technologically essential to the use of the intercommunication system, but there is no doubt that they are "appropriate and helpful" to the use of the system.

That defendant's position is contrary to the statutory language, is further indicated by the inclusion of "switching capacity" as one of the associated services listed in subsection (d)(2). These services, which include switchboards and key sets, are likewise not technologically essential to the functioning of the private intercommunication system because it can be used without them. The same is true of the other associated services involved here.

Moreover, one of the considerations which prompted Congress to enact section 4252 influences us to adopt the definition of "necessary" as found in *Welch v. Helvering*. At the time Congress was considering passage of the 1965 Act, it was known that private communication companies were manufacturing and selling highly sophisticated intercom equipment which far exceeded what was technologically essential to the basic system. This equipment was similar or identical in function to the associated services in issue. Congress was well aware that these highly advanced pieces of equipment were available for subscriber-owned use and also that the subscriber-owned equipment had always been exempt from the excise tax. The Congressional intent to give telephone company equipment the same tax advantage then allowed subscriber-owned equipment is shown in the Committee reports:

8. Treas.Reg. § 1.613–3(f)(2)(iii).

\* \* \* With the ever-increasing number of varied services which modern science makes it possible for telephone companies to provide, the tax on private communication systems represents a severe competitive handicap to the expanded use of these new and varied services.

For the reasons indicated above, your committee's bill provides an exemption from the tax on local telephone service for private communications service if a separate charge is made for this service. \* \* \* [H.R.Rep.No.433, 89th Cong., 1st Sess., *reprinted in* 1965 *U.S.Code Cong. & Admin.News* 1677.]

Although it would be possible for a modern-day business to function without the associated services here in dispute, it would be extremely inconvenient and wasteful of the time of its employees to do so. Without a telephone key set, any consumer who desired to use more than one line would have to keep several telephones on his desk, one for each line. A system without blinking lights or "hold" buttons would cause interruptions and disruptions of telephone calls. Therefore, from the standpoint of modern business operations, the associated services are almost as "necessary" as the telephone itself. We think Congress must have been mindful of these circumstances, since it employed the phrase "necessary *to the use of*" a private communication system. This language emphasizes the taxpayer's judgment as to what is or is not necessary—a concept which includes what is appropriate and helpful. *Welch v. Helvering, supra,* at 113, 54 S.Ct. 8.

Secondly, we reject defendant's interpretation because it has been unable to point out to us any "associated services" which would qualify for the tax exemption except those which are integral parts of the basic intercommunication system rather than the separately defined associated services. In Rev.Rul. 74–590, it was held that charges made in connection with an unrestricted Centrex system for dual use equipment such as illumination lights, wink hold relays and hold buttons, were taxable, because the equipment was not "necessary or unique to the use of the private communication service." "Unrestricted service" was defined as an installation which, in addition to providing private communication service, also provides direct access to local telephone service. Although there were separate charges for the private communication system, the local telephone service, and for each article of accessorial (associated services) equipment, the ruling was apparently based on the fact that the associated services equipment was dual use equipment which was used both in connection with the local telephone service and with the private communication system. The only authority cited for the ruling was Situation 2 of Rev. Rul. 73–401, 1973–2 C.B. 363. As that ruling shows, the example cited was a device which was used solely to provide access to local telephone service. Unlike the associated services involved here, it was not dual use equipment and was not used in connection with the private intercommunication system. Obviously therefore, it was not necessary to the use of that system. We think that Rev.Rul. 74–590 is inconsistent with the plain language of section 4252(d)(1), which provides that the private communication service shall be exempt from tax "regardless of whether such \* \* intercommunication system may be connected through switching" to local telephone service. Moreover, the Administration bill expressly contemplated that charges for the private intercom system and associated services would not be subject to tax because of their dual use, *i. e.,* their access to or routing through a local exchange. In the President's letter which submitted the Administration bill to Congress, there was an analysis of the provisions of the Administration bill including the following recommendation for tax exclusion of the charges for "private communication services."

Under present law, a private communication system (that is, a communication system solely for the use of a single subscriber) is taxable as a general telephone service to the extent it involves telephones that have access outside the private system to a local exchange system.

Similarly, a private line is presently taxed as a general telephone service if it is routed through a local exchange. These services, along with associated services which are necessary or unique to such private communication services, constitute "private communication services" as defined in paragraphs (1) and (2) of section 4252(d) of the code, as amended by the bill, if a separate charge is made for such services. * * * Private communications services, as so defined, are exempted from tax under the bill.[9]

Finally, in reaching this decision, we are guided by several well known rules of statutory construction. It is a long-established principle that if there is a serious doubt as to taxability, the doubt should be resolved in favor of the taxpayer. *Allstate Ins. Co. v. United States, supra; Ellis v. United States*, 416 F.2d 894, 897 (6th Cir. 1969); *McFeely v. Commissioner*, 296 U.S. 102, 111, 56 S.Ct. 54, 80 L.Ed. 83 (1935). Here, there is such a doubt as to taxability, because the applicable statute contains no definition of the phrase "necessary or unique," and there is virtually no legislative history explaining what Congress intended by it. The doubt is intensified by the fact that although some 12 years have elapsed since the passage of the Excise Tax Reduction Act of 1965, the Secretary has issued no clarifying regulation as authorized by 26 U.S.C. § 7805. This is not a case where the failure to issue a regulation can be attributed to the fact that the meaning of the statute is so clear that there is no necessity for a regulation. The conflicting revenue rulings, to which we have referred, are strong evidence of doubt and confusion by the I.R.S. as to the correct interpretation of the statute.

There is another canon of construction which is even more applicable in this instance. "Where a particular construction will produce inequality and injustice, such construction is to be avoided if another and more reasonable interpretation is perceived." *Shattuck v. Gallagher*, 218 F.2d 428, 429 (6th Cir. 1955), *Gellman v. United States*, 235 F.2d 87, 92 (8th Cir. 1956). The unfairness and inequity present in this case are clearly demonstrated by the fact that from the time that Rev.Rul. 73–270 was issued until April 28, 1977, when Rev.Rul. 77–189 was announced, the I.R.S. held that the associated services subscribed to by plaintiff and other Centrex users were taxable, whereas the virtually identical services provided by the PBX system were held to be tax-free. Rev.Rul. 77–189 is in itself a tacit admission of the unequal treatment which had been accorded the taxpayers.

## CONCLUSION

In summary we find that the associated services to which plaintiff subscribes meet the requirements of a "private communication" system as defined in section 4252(d) in that these services are both "separately charged" and "necessary * * * to the use" of a private communication system. The charges collected for such associated services are therefore exempt from the excise tax imposed by section 4251. Accordingly, judgment is entered in favor of plaintiff and against defendant for the sum of $28,069.31, with interest thereon as provided by law.

---

**9.** H.R.Doc.No.173, 89th Cong., 1st Sess., 1965, pp. 105–106.