BENNETT, Circuit Judge.
 

 This is an appeal from a judgment of the United States Claims Court.
 
 *
 
 The court determined that amounts paid by the lessees of Trans-Lux’s teletypewriters to Trans-Lux were not “charges” paid for “teletypewriter exchange service” within the meaning of 26 U.S.C. § 4252(c) (1976). The court therefore held that Trans-Lux was entitled to recover the federal excise taxes paid to the United States in the last quarter of 1975 and the first two quarters of 1976
 
 [1]
 
 as computed on the rental and service charges paid by appellee’s customers. Because the excise taxes were actually paid by the lessees of Trans-Lux’s teletypewriters,
 
 [2]
 
 the trial judge reserved determination of the amount of recovery, if any, for further proceedings.
 
 [3]
 
 For the reasons which follow, we
 
 affirm.
 

 Trans-Lux is a Delaware corporation that has its principal place of business in Nor-
 
 *964
 
 walk, Connecticut. It is engaged in (among other things) the business of manufacturing, assembling, selling, and leasing teletypewriter terminals (TLT’s) for use in Western Union’s domestic teletypewriter exchange service (the Telex network).
 

 In the past, Western Union had required that its Telex network subscribers use terminal equipment provided by Western Union. Since the early 1970’s, however, Western Union has permitted its subscribers to use terminal equipment acquired, by purchase or lease, from other vendors or sources. These terminals are known as customer-provided terminals (CPT’s).
 

 Trans-Lux was one of the first independent producers to assemble a small, lightweight, electronic memory teletypewriter that could be used in Western Union’s Telex network. For Trans-Lux’s teletypewriters to be a functional part of the Telex network they had to be physically connected to a Telex Line Adapter (TLA). The TLA, which is a “black box” that is installed by Western Union on the subscriber’s premises, acted as an interface between the Telex network and the CPT. Once a technologically compatible CPT was connected to a TLA, a subscriber to the Telex network could direct-dial any other network subscriber through Western Union’s central exchange and establish a point-to-point connection. Following the establishment of a point-to-point connection, written communications between the subscribers could take place.
 

 In order to use Western Union’s Telex network and to lease a teletypewriter from Trans-Lux, a subscriber had to enter into separate contracts with Western Union for the use of the Telex network (including the transmission line and the TLA) and with Trans-Lux for the lease of the TLT. Every month Western Union would then bill the subscriber a flat charge for what it called “Telex Network Access,” a further charge based on usage, and an amount for federal excise taxes. Trans-Lux would separately bill the subscriber a flat monthly charge for both the rental and service on its teletypewriters. This charge included an amount for federal excise taxes computed on the total rental and service charges.
 

 Trans-Lux collected the excise taxes from its lessees on the authority of Rev.Rul. 73-401, 1973-2 C.B. 363. Revenue Ruling 73-401, citing Treas.Reg. § 49:4252-5(b) (1964), states that “in determining the amount of [excise] tax due [on teletypewriter exchange service], the amount paid for the service shall include all charges made in connection with the furnishing of any teletypewriter exchange service, such as charges for equipment, instruments, and other apparatus.” Although this language clearly covers the rental and service payments on Trans-Lux’s teletypewriters,
 
 [4]
 
 Trans-Lux contends that the Internal Revenue Service’s reliance on Treas.Reg. § 49.-4252 in issuing Rev.Rul. 73-401 is misplaced.
 
 [5]
 
 Treasury Regulation § 49.4252 interprets sections 4251(a)(1) and 4252 of the Internal Revenue Code as amended by the Excise Tax Technical Changes Act of 1958, Pub.L. No. 85-859, 72 Stat. 1275, 1289-90. Subsequent to the promulgation of Treas. Reg. § 49.4252, however, the excise tax provisions on communication services were significantly amended by the Excise Tax Reduction Act of 1965, Pub.L. No. 89 — 44, 79 Stat. 136,145 — 48. It is Trans-Lux’s contention that the 1965 amendments narrowed the scope of the excise tax on teletypewri
 
 *965
 
 ter exchange service so that it no longer applies to the leasing of teletypewriters.
 

 Thus, the issue in this case is whether the definition of teletypewriter exchange service, as amended by the Excise Tax Reduction Act of 1965, still covers the rental and service payments on teletypewriters that are used in a teletypewriter exchange network. In deciding this issue, it is necessary to consider not only the statutory language as amended, but also the purpose and legislative history of the 1965 Act.
 

 I.
 
 Definition of Teletypewriter Exchange Service.
 

 Teletypewriter exchange service was first defined by the Excise Tax Technical Changes Act of 1958, Pub.L. No. 85-859, 72 Stat. 1290, as “any service where a teletypewriter (or similar device) may be connected (directly or indirectly) to an exchange operated by a person engaged in the business of furnishing communication service, if by means of such connection communication may be established with any other teletypewriter (or similar device).” This definition, however, was significantly amended by the Excise Tax Reduction Act of 1965, Pub.L. No. 89-44, 79 Stat. 146. Teletypewriter exchange service is now defined to be—
 

 the access from a teletypewriter or other data station to the teletypewriter exchange system of which such station is a part, and the privilege of intercommunication by such station with substantially all persons having a teletypewriter or other data stations constituting a part of the same teletypewriter exchange system, to which the subscriber is entitled upon payment of -a charge or charges .... [26 U.S.C:. § 4252(c) (1976).]
 

 The excise tax oh teletypewriter exchange service is thus imposed on amounts paid by a subscriber that entitle' hiih to (1) access from a teletypewriter to the teletypewriter exchange,
 
 and
 
 (2) the privilege of intercommunication.
 

 It is clear on the facts of this case that the two requirements of access and privilege are not met. By leasing a teletypewriter from Trans-Lux, a subscriber was only entitled to the use of a teletypewriter and service on that machine. As the trial judge stated, a subscriber was not provided “a ‘service’ consisting of the ‘access
 
 from *
 
 * ’ the TLT
 
 to
 
 the Telex network,
 
 and
 
 the ‘privilege’ of intercommunication with other subscribers to that network, in any normal sense of those words.” (Emphasis in original.) This reading of the statute is also supported by the technological meaning of the word access. From the weight of the credible evidence, the trial judge determined that the word access was recognized in the communications field in general, and with respect to the Telex network in particular, as meaning the interface or connection between the Telex network’s transmission lines (and the central exchange) and the CPT. Access to the Telex network was thus provided by Western Union’s TLA (or black box), and not by Trans-Lux’s teletypewriters.
 

 The government argues that this interpretation of the statute is too narrow; that the access and privilege requirements are met here because (1) Trans-Lux’s customers needed both Trans-Lux’s teletypewriters and Western Union’s transmission and exchange facilities in order to communicate over the Telex network, and (2) the teletypewriters provided a communication service. _ The statute, however, does not focus on the subscriber’s need or the service provided by a teletypewriter; it speaks of charges that entitle a subscriber to access from the TLT to the Telex network, and the privilege of intercommunication. Only the charges paid to Western Union for Telex network access and usage entitled the subscriber to the access to and the privilege of intercommunication. For example, the service provided by a teletypewriter and the subscriber’s need for the teletypewriter is the same whether or not the teletypewriter is acquired by purchase or lease. But it is clear that payments to purchase a teletypewriter are not subject to the excise tax. See Rev.Rul. 73-401, 1973-2 C.B. 363, 364.
 

 Therefore, the government’s comprehensive definition of access and privilege in
 
 *966
 
 terms of the subscriber’s need and the teletypewriter’s service does not comport with either the plain wording of the statute or the technological meaning of access. It must be assumed, at least in the absence of a valid basis for concluding otherwise, that the framers of a statute must have “intended to convey the ordinary meaning which is attached to the language they used.”
 
 Allstate Insurance Co. v. United States,
 
 550 F.2d 629, 636, 213 Ct.Cl. 96 (1977); see
 
 also Ampex Corp.
 
 v.
 
 United States,
 
 620 F.2d 853, 857-62, 223 Ct.Cl. 428 (1980); Ocean
 
 Drilling & Exploration Co. v. United States,
 
 600 F.2d 1343, 1347-48, 220 Ct.Cl. 393 (1979). In construing the statutory language, however, the government urges us to consider both the purpose and legislative history of the statute. “ ‘When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no “rule of law” which forbids its use, however clear the words may appear on “superficial examination.” ’ ”
 
 Train v. Colorado Public Interest Research Group,
 
 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (quoting
 
 United States
 
 v.
 
 American Trucking Associations,
 
 310 U.S. 534, 543-44, 60 S. Ct. 1059, 1063-64, 84 L.Ed. 1343 (1940)). This is the position taken by the trial court while cautioning that, in the words of Chief Judge Jones, “[a]n explanatory tale should not wag a statutory dog.”
 
 A.P. Green Export Co. v. United States,
 
 284 F.2d 383, 386, 151 Ct.Cl. 628 (1960).
 

 II.
 
 Purpose and Legislative History of the Excise Tax Reduction Act of 1965.
 

 A reading of the legislative history indicates that the Excise Tax Reduction Act of 1965 served three purposes: (1) it lowered the rate of taxation; (2) it created an exemption for private communication services; and (3) it updated and modified the statutory language. Each of these purposes will be discussed in turn.
 

 The first purpose of the 1965 Act was to phase-out the excise tax on communication services
 
 [6]
 
 over a 4-year period. Thus, the tax was to be reduced from 10 percent to 3 percent on January 1, 1966, with subsequent annual reductions of 1 percent until the tax was eliminated entirely on January 1, 1969.
 
 See
 
 H.R.Rep. No. 433, 89th Cong., 1st Sess. 29-30,
 
 reprinted in
 
 1965 U.S.Code Cong. & Ad.News 1645, 1676; S.Rep. No. 324, 89th Cong., 1st Sess. 35,
 
 reprinted in
 
 1965 U.S.Code Cong. & Ad.News 1690, 1725. Subsequent legislation, however, on eight occasions, has adjusted the phase-out rates and phase-out period. The excise tax on communication services was last increased from 1 percent to 3 percent for a period of 3 years, with eventual elimination scheduled for January 1, 1986.
 
 See
 
 Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97-248, tit. II, § 282, 96 Stat. 324, 568.
 

 Appellant views this recent increase in the excise tax as an indication that Congress’ clear purpose was not to have the tax determined in a restrictive fashion. It therefore urges the court to reject the plaintiff-appellee’s arguments because the “plaintiff would substantially reduce the base of the tax, [when] Congress is presently considering an increase in the ‘telephone tax’ because of current extraordinary revenue demands .. . . ” We believe that this argument is of dubious validity. It must be remembered that it is not the intent of the present Congress that is important, but the intent of the Congress that enacted the 1965 legislation. If the government believes that the scope of the statute should be interpreted in an expansive manner because the current Congress has increased the excise tax, then it would follow that the 1965 Congress intended the scope of the statute to be interpreted in a restrictive fashion, as that Congress lowered the excise tax significantly.
 

 We do not think that this argument, however, has any more validity than the government’s original premise. We raise it merely to point out that the current extension and increase of the communication
 
 *967
 
 services excise tax should not affect the interpretation of congressional intent in 1965.
 

 A second purpose of the 1965 Act was to create an exemption for private communication services.
 
 [7]
 

 See
 
 H.R.Rep. No. 433,
 
 supra,
 
 at 30-31, 1965 U.S.Code Cong. & Ad. News at 1677-78; S.Rep. No. 324,
 
 supra,
 
 at 36, 1965 U.S.Code Cong. & Ad.News at 1726-27. This exemption provided that the charges for intrapremise telephone services and associated services were not subject to the excise tax even though the telephones also had access to a local exchange system. The exemption, however, was contingent on a separate charge being made for the intrapremise service or associated service.
 

 Congress enacted the private communication services exemption in order to correct the competitive imbalance that had developed between telephone company-furnished services and subscriber-owned equipment.
 
 See Western Electric Co. v. United States,
 
 564 F.2d 53, 57 (Ct.Cl.1977). Under the 1958 Excise Tax Technical Changes Act, a subscriber to the telephone company’s Centrex or PBX systems (communication systems that allowed both intrapremise and interpremise communication) was subjected to the federal excise tax on his entire payment to the telephone company for service and equipment. But if the subscriber purchased its intercom equipment outright from a communications equipment manufacturer, the equipment was free of the federal excise tax.
 
 Id.
 
 at 57. Because the telephone companies were losing business to companies that provided telephone and microwave equipment that could be purchased and operated by the users themselves, Congress created an exemption to the excise tax on local telephone service.
 
 See
 
 H.R. Rep. No. 433,
 
 supra,
 
 at 30-31, 1965 U.S. Code Cong. & Ad.News at 1677; S.Rep. No. 324,
 
 supra,
 
 at 36, 1965 U.S.Code Cong. & Ad.News at 1726.
 

 The appellant argues that this exemption for private communication services was the single material change intended by the 1965 Act (other than the rate reduction). The legislative history, however, indicates a third purpose — the intent to update and modify the definitions of local telephone service, toll telephone service, and teletypewriter exchange service.
 
 See
 
 H.R.Rep. No. 433,
 
 supra,
 
 at 30, 1965 U.S.Code Cong. & Ad.News at 1676; S.Rep. No. 324,
 
 supra,
 
 at 35, 1965 U.S.Code Cong. & Ad.News at 1725. The government contends that these definitions were revised “to reflect the exemption for private communications services.” Material Prepared by the Executive Branch Concerning Recommendations Proposed by the President Relative to Excise and Fuel Taxes Including Draft Bills and Section by Section Analysis, House Comm, on Ways and Means, 89th Cong., 1st Sess. 20 (Comm.Print 1965) [hereinafter cited as Material Prepared by Executive Branch]. To an extent this may be true. But it is also likely that the definitions were updated and modified in order to reflect and to meet the changing technology and market conditions of the industry. Furthermore, the legislative history indicates that these definitions were updated and modified in order “to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied.” H.R.Rep.
 
 *968
 
 No. 433,
 
 supra,
 
 at 30, 1965 U.S.Code Cong. & Ad.News at 1676; S.Rep. No. 324,
 
 supra,
 
 at 35, 1965 U.S.Code Cong. & Ad.News at 1725. If “merely” is arguably ambiguous, there is at least a powerful inference that the drafters of the Act intended to say that “the service furnished (rather than the equipment furnished) is the important factor.” Material Prepared by .Executive Branch,
 
 supra,
 
 at 21. When this legislative focus on the service provided is read in conjunction with the statutory focus on the access to and the privilege of intercommunication, it seems evident that the charges paid by Trans-Lux’s subscribers to TransLux are not within the scope of the excise tax on teletypewriter exchange service.
 

 In conclusion, we find that the government has not overcome the normal understanding of the bare statutory language by a persuasive showing from the purpose or history of the legislation.
 
 See Ampex,
 
 620 F.2d at 858 n. 9. At most, it has shown that conflicting inferences may be drawn from the limited legislative history. If this leads to a conclusion that there must be doubt as to taxability, then it should be resolved in favor of the taxpayer.
 
 Western Electric Co. v. United States,
 
 564 F.2d at 66. We therefore hold that Trans-Lux is entitled to recover the federal excise taxes paid to the United States in the last quarter of 1975 and the first two quarters of 1976, with a determination of the amount of recovery, if any, reserved for further proceedings in the Claims Court. Accordingly, after thorough consideration of the parties’ submissions and after oral argument, the judgment of the United States Claims Court is affirmed.
 

 AFFIRMED AND REMANDED.
 

 *
 

 Pursuant to order of this court dated October 4, 1982, Judge Wood, on October 8, 1982, entered a final judgment in accordance with his opinion of March 9, 1982.
 

 [1]
 

 . Trans-Lux has also instituted a similar suit involving the periods July 1, 1976 to September 30, 1977, January 1, 1978 to March 31, 1978, and January 1, 1979 to March 31, 1979. This action is presently pending before the United States Claims Court, No. 448-8IT.
 

 [2]
 

 . The excise tax on teletypewriter exchange service is imposed on the person who pays for the service, but the company providing the service is obligated to collect the tax from the taxpayer and remit it to the government.
 
 See
 
 26 U.S.C. §§ 4251(a)(1), 4291, 7501 (1976). Thus, it is the government’s contention that Trans-Lux is not entitled to recover until it provides proof of either repayment of the excise taxes involved to its lessees or obtains their written consents to Trans-Lux’s recovery of these amounts.
 

 [3]
 

 . Rule 42(c) of the United States Claims Court provides:
 

 “(c) Separate Determination of Liability. Upon stipulation of the parties, approved by the court, or upon order of the court, a trial may be limited to the issues of law and fact relating to the right of a party to recover, reserving the determination of the amount of recovery, if any, for further proceedings. In any case, whether or not a stipulation or order has been made under this subdivision (c), the court, upon determining that a party is entitled
 
 *964
 
 to recover, may reserve determination of the amount of the recovery for further proceedings. Any motion for reconsideration shall be filed not later than 14 days after a separate determination of liability.”
 

 [4]
 

 . This language, however, has been interpreted by the Internal Revenue Service as not including amounts paid to purchase teletypewriters. See Rev.Rul. 73-101, 1973-2 C.B. 363, 364 (“Where ... the equipment is
 
 purchased
 
 by the user there is no ‘amount paid’ with respect to a taxable communications service, or for the right to use equipment with a taxable service. Therefore, the sale or use of equipment is not subject to the tax imposed by section 4251 of the Code.”) (emphasis in original).
 

 [5]
 

 . In this action, the government does not contend that Treas.Reg. § 49.4252-5(b) is controlling; nor does it rely on Rev.Rul. 73-401, 1973-2 C.B. 363.
 

 [6]
 

 . The Internal Revenue Code defines communication services as including local telephone service, toll telephone service, and teletypewriter exchange service.
 
 See
 
 26 U.S.C. § 4251(a)(1) (1976).
 

 [7]
 

 . The Internal Revenue Code defines “private communication service” as—
 

 “(1) the communication service furnished to a subscriber which entitles the subscriber—
 

 “(A) to exclusive or priority use of any communication channel or groups of channels, or
 

 “(B) to the use of an intercommunication system for the subscriber’s stations,
 

 “regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),
 

 “(2) switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and
 

 “(3) the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system,
 

 “except that such term does not include any communication service unless a separate charge is made for such service.” [26 U.S.C. § 4252(d) (1976).]