IRS v. WorldCom

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2012

(Argued: January 11, 2013                                    Decided: July 22, 2013)

Docket No. 12-803

————————

IN RE: WORLDCOM, INC.,

*Debtor*.

————————

INTERNAL REVENUE SERVICE,

*Appellant,*

—v.—

WORLDCOM, INC.,

*Debtor-Appellee*.

————————

B e f o r e :

KEARSE, KATZMANN, *Circuit Judges*, and RAKOFF, *District Judge*.*

————————

Appeal from a judgment of the United States District Court for the Southern District of

---

* The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

New York (Forrest, *J.*), affirming the decision of the bankruptcy court (Gonzalez, *C.J.*), which granted the WorldCom Debtors' objection to the IRS's proof of claim and the Debtors' motion for a refund of federal communication excise taxes previously paid by WorldCom. We hold that the dial-up Internet service purchased by WorldCom from local telephone companies, known as COBRA, was a "local telephone service" that provided "access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons . . . constituting a part of such local telephone system." 26 U.S.C. § 4252(a). WorldCom must therefore pay the three-percent excise tax federal law imposes on the purchase of any local telephone service, *id.* § 4251, and the Debtors are not entitled to a refund from the IRS. For the reasons stated below, the judgment of the district court is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this Opinion.

_____

BENJAMIN H. TORRANCE (Sarah S. Normand, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellant*.

ALFREDO R. PÉREZ, Weil, Gotshal & Manges LLP, Houston, TX, *for Debtor-Appellee*.

_____

KATZMANN, *Circuit Judge*:

This case calls on us to decide if the bankrupt telecommunications company WorldCom must pay federal excise taxes on the purchase of a telecommunications service that connected people using dial-up modems to the Internet. Appellant, the Internal Revenue Service ("IRS"), appeals from a judgment of the United States District Court for the Southern District of New York (Forrest, *J.*), which upheld the decision of the Bankruptcy Court (Gonzalez, *C.J.*) to grant

2

the objection of the reorganized debtors ("Debtors")[1] to the IRS's proof of claim for taxes owed and the Debtors' refund motion for the taxes WorldCom had already paid.

In the late 1990s, WorldCom purchased a service from local telephone companies called "central-office-based remote access," or "COBRA," that gave people the ability to use their modems to connect to WorldCom's network (and the Internet) over their regular telephone line. The tax code adds a three-percent excise tax to the purchase of a "local telephone service."  26 U.S.C. § 4251.  A "local telephone service" is any service that provides "access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system."  *Id.* § 4252(a).  On appeal, the IRS contends that the district and bankruptcy courts erred in concluding that COBRA was not taxable as a local telephone service.

For the reasons set forth below, we hold that WorldCom purchased a "local telephone service" when it paid for COBRA services, and that WorldCom must therefore pay federal communication excise taxes on those transactions.  Accordingly, we reverse the judgment of the district court and remand the case for further proceedings consistent with this Opinion.

**BACKGROUND**

*I.    Factual Background*

The following background is drawn from the bankruptcy court's factual findings, adopted

---

[1] Although the caption names WorldCom, Inc. as the formal debtor-appellee, this adversary proceeding involves several of the debtors in the jointly administered bankruptcy.  The principal debtor changed its name from WorldCom, Inc. to MCI Inc. and is currently operating as Verizon Business Global LLC.  The subsidiary debtors are principally UUNet Technologies, Inc. and MCI WorldCom Network Services Inc.  For convenience, we refer to the relevant debtors as the "Debtors," following the convention of the parties and the district court.  For readability, we refer to the transactions at issue as purchased by "WorldCom."

by the district court and unchallenged by either party on appeal:[2]

In the late 1990s, WorldCom, originally a long-distance telephone service provider, began building a massive Internet network to provide data services. As part of building that network, WorldCom purchased a now-obsolete telecommunications service known as "central-office-based remote access," or "COBRA" from local telephone companies. COBRA allowed local telephone subscribers to connect to the Internet using a dial-up modem.[3]

In order to connect to the Internet through COBRA, a subscriber's modem would call the COBRA access number over the subscriber's normal telephone line (the public switched telephone network or "PSTN" line). After dialing the COBRA number, the modem signal traveled over the PSTN, the same network on which traditional telephone calls travel. The signal then passed through a switch at the local telephone company's central office that routed the signal over the telephone company's COBRA-specific high-capacity telephone lines, known as "primary rate interface" or "PRI" lines. The PRI lines carried the signal to a network access server, which converted the phone signal to an Internet-appropriate format (TCP/IP) using digital signal process ("DSP") cards. The network access server sent this TCP/IP data signal to a router through another PRI line contained within the network access server, and the router then transmitted the signal, along with other aggregated dial-up data signals, to WorldCom's network on a high-speed data line through the egress of the network access server. The system also

---

[2] The parties accuse each other of waiving various arguments by not challenging the bankruptcy court's factual findings. But neither party actually challenges the facts as found by the bankruptcy court, only the legal import of those factual findings on taxability.

[3] We provide here only the factual background that is necessary to resolving the issues present in this appeal. For further background on WorldCom and COBRA, see *In re WorldCom, Inc.* (*WorldCom I*), 371 B.R. 19, 23–24 (Bankr. S.D.N.Y. 2007).

worked in reverse and could convert a data signal from the Internet to a phone signal that could be carried through the local telephone lines back to the user's modem. COBRA provided local telephone customers with a two-way connection to the Internet.[4]

WorldCom plugged the output Internet data stream from the local telephone company's network access server into its own network, and sold access to the stream to Internet Service Providers ("ISPs"), like AOL, which in turn sold access to the Internet to people with dial-up modems. The PRI lines and all aspects of the network access server up through the egress port where WorldCom plugged in its network were considered COBRA equipment and were used by the local telephone companies as part of providing COBRA service to WorldCom. WorldCom paid the local telephone companies a monthly fee for access to COBRA.

The parties agree that the COBRA system was theoretically capable of transmitting an ordinary telephone call. The PRI lines that carried a modem signal to the network access server could also carry a regular voice communication signal. Instead of connecting to the network access server, those PRI lines could have plugged into a "PBX," which is a switch that allows for voice communication over PRI lines. The COBRA-specific PRI lines, however, did not include a PBX switch. As purchased by WorldCom, COBRA was not set up for voice communication.

WorldCom also could not reconfigure the PRI lines, which, along with the other COBRA equipment, were controlled by the local telephone companies. It could access COBRA only remotely to disable a modem if it was malfunctioning or make limited software changes. Accordingly, within the system provided by the COBRA service, once the network access server converted a telephone signal from a modem into Internet-friendly TCP/IP packets (the

_____

[4] For diagrams depicting COBRA and its related processes, see J. App'x 536 & 538.

5

high-speed data stream), it was no longer possible to transmit a traditional voice communication. A WorldCom employee's husband could not use COBRA to call his wife's office and ask her whether she wanted to get lunch.[5]

*II.      Procedural History*

WorldCom filed its Chapter 11 bankruptcy petition on July 21, 2002, and the bankruptcy court confirmed the reorganization plan on October 31, 2003. *In re WorldCom, Inc.* (*WorldCom I*), 371 B.R. 19, 24–25 (Bankr. S.D.N.Y. 2007). After the court confirmed the plan, the IRS filed a proof of claim requesting that the Debtors pay $16,276,440.81 in excise taxes on WorldCom's purchase of COBRA services. *WorldCom I*, 371 B.R. at 25. The Debtors objected to the IRS's claim and additionally moved for a refund of the $38,297,513 in excise taxes WorldCom had already paid on COBRA.

The bankruptcy court (Gonzalez, *J.*) held an evidentiary hearing on February 1, 2006. By opinion dated June 1, 2007, the bankruptcy court ruled in favor of the Debtors, granting both the refund motion and their objection to the IRS's proof of claim. *WorldCom I*, 371 B.R. at 32. The IRS appealed *WorldCom I* to the district court. On August 7, 2009, the district court (Jones, *J.*) concluded that the bankruptcy court erred in ruling that section 4252(a) required WorldCom to have the privilege to both initiate and receive telephonic quality communication. *In re*

---

[5] Before the bankruptcy court, the IRS argued that COBRA could transmit "voice over Internet protocol," or "VoIP." The bankruptcy court, however, concluded that the COBRA contract did not permit VoIP that would require the telephone company to convert the telephone signal into an Internet signal, that the COBRA service as configured could not carry VoIP signals, and that, with respect to computer-to-computer VoIP (*e.g.*, Skype), the technology then in use was too slow to transmit VoIP. Accordingly, the bankruptcy court concluded that COBRA could not transmit telephonic quality communication through VoIP. The IRS does not challenge this factual finding on appeal.

*WorldCom, Inc.* (*WorldCom II*), No. 07 Civ. 7417, 2009 WL 2432370, at *3–4 (S.D.N.Y. Aug. 7, 2009) (holding that as long as two-way communication occurred, it was irrelevant which party initiated the call) (citing *USA Choice Internet Servs., LLC v. United States* (*USA Choice II*), 522 F.3d 1332, 1338–39 (Fed. Cir. 2008)). Accordingly, the district court reversed and remanded to the bankruptcy court for further factual findings on whether COBRA was a "local telephone service."

On remand, the parties submitted additional proposed findings of fact and conclusions of law, and on June 15, 2011, the bankruptcy court again ruled in favor of the Debtors. *In re WorldCom, Inc.* (*WorldCom III*), 449 B.R. 655 (Bankr. S.D.N.Y. 2011). The bankruptcy court concluded that the only service WorldCom had purchased was the ability to plug into the high-speed Internet data stream provided by the local telephone companies, *i.e.*, the egress from the network access server. Because that data stream could not support "telephonic quality communication," which, in the bankruptcy court's interpretation, meant regular phone calls, and because WorldCom could not reconfigure COBRA to provide it with telephonic quality communication, the bankruptcy court concluded that WorldCom had not purchased a "local telephone service" as defined by the statute. The court distinguished WorldCom's purchase of COBRA services from other cases finding that similar Internet services were taxable. *See USA Choice II*, 522 F.3d at 1341; *Comcation, Inc. v. United States*, 78 Fed. Cl. 61, 65 (2007). In those cases, the taxpayer purchased a service that provided it with the raw telephone signals, which the company itself converted to an Internet signal. According to the bankruptcy court, because the companies in those cases had access to the telephone lines, they were provided with signals capable of "telephonic quality communication."

7

The IRS again appealed to the district court. On December 22, 2011, the district court (Forrest, *J.*) affirmed the judgment of the bankruptcy court. *In re WorldCom, Inc.* (*WorldCom IV*), No. 11 Civ. 5463, 2011 WL 6434007 (S.D.N.Y. Dec. 22, 2011). The district court emphasized that WorldCom itself did not connect dial-up users to the Internet and characterized COBRA as simply an "intermediate" step in the Internet-connection process. *Id.* at *5–7. According to the court, this was another reason to distinguish COBRA from the services at issue in *Comcation* and *USA Choice II*, where the ISP plaintiffs connected subscribers to the Internet directly. The district court then evaluated whether this "intermediate" step "c[ould] constitute a stand alone 'local telephone service'" for purposes of section 4252(a). *Id.* at *5. After retracing the process of how the COBRA service operated in practice, the district court concluded that the "nanosecond" of time that the modem signal spent traversing the PRI lines before being converted into an Internet data stream by the network access server was "[s]urely not" "what Congress meant to tax as a 'local telephone service.'" *Id.* at *7.

The district court further concluded that COBRA did not provide the ability to communicate with "substantially all persons" who are part of "such [asserted] telephone system" as required by statute. *Id.* at *7 (brackets in original). The court determined that COBRA was distinct from the local telephone system, and because it "[wa]s a self-contained service" within the telephone company's facility, there was no way for any "person" to access the telephonic quality communication that the COBRA PRI lines could theoretically support. *Id.* Even though COBRA interfaced with the normal local telephone network—which the court delineated as a separate "service"—people who used their modems to connect to the Internet through COBRA could not communicate with the COBRA system, nor could WorldCom communicate with them.

8

The court entered judgment in favor of the Debtors on December 28, 2011. This appeal followed.

**DISCUSSION**

Because neither party disputes the bankruptcy court's factual findings or the district court's adoption of those findings, we address only the legal conclusions of the district court. Our review of those conclusions is *de novo*. *In re CBI Holding Co.*, 529 F.3d 432, 449 (2d Cir. 2008). Federal tax assessments are presumed to be correct and constitute prima facie evidence of liability. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *United States v. McCombs*, 30 F.3d 310, 318 (2d Cir. 1994). The taxpayer bears the burden to prove that the assessment was incorrect. *McCombs*, 30 F.3d at 318. This burden applies within bankruptcy proceedings. *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 26 (2000).

I.      *Local Telephone Service*

Federal law imposes a three-percent excise tax on amounts paid for three kinds of "communications services": "local telephone service"; "toll telephone service"; and "teletypewriter exchange service." 26 U.S.C. § 4251. The IRS contends that COBRA is a local telephone service, which the statute defines as:

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

> (2) any facility or service provided in connection with a service described in paragraph (1).

*Id.* § 4252(a).

Whether COBRA constitutes a "local telephone service" is a question of statutory interpretation. In interpreting any statute, we start with its text, *Auburn Hous. Auth. v. Martinez*,

9

277 F.3d 138, 143 (2d Cir. 2002), giving the language its ordinary meaning, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012). Section 4252(a)(1) sets forth two requirements for a local telephone service, both of which must be satisfied: (a) "access to a local telephone system"; and (b) "the privilege of telephonic quality communication" with "substantially all" of the people who are part of that system. We address each element in turn.

A.      Access to a local telephone system

We begin with the element of "access to a local telephone system." Although we have not previously addressed the proper interpretation of section 4252(a), the Federal Circuit has confronted its scope. After reviewing ordinary definitions of "access," the Federal Circuit found that "general dictionary definitions of 'access' provide little insight" into what is covered by the tax. *USA Choice II*, 522 F.3d at 1337. But the court noted it had previously interpreted "access" in the context of access to a teletypewriter exchange system under section 4252(c) of the statute, where it held that "the 'technological meaning of the word access . . . in the communications field in general . . . mean[s] the interface or connection between . . . the central exchange and the [customer terminal].'" *Id.* (quoting *Trans-Lux Corp. v. United States*, 696 F.2d 963, 965 (Fed Cir. 1982)) (alterations and brackets in *Trans-Lux*). Based on this interpretation of the closely related teletypewriter exchange service definition, the Federal Circuit concluded that "'access' simply means connectivity." *Id.*

The Federal Circuit's definition of access was adopted by the district court in this case, *see WorldCom II*, 2009 WL 2432370, at *3, and is undisputed by the parties. We agree. "Access to a local telephone system" simply means a service that provides a connection to a local telephone system.

We must still determine, however, what level of connectivity is sufficient to provide "access." Several of our sister circuits have noted that because section 4252(a) speaks of "access to *a* local telephone system," Congress intended that the service provide a direct connection to a specific local system. *See, e.g.*, *OfficeMax, Inc. v. United States*, 428 F.3d 583, 599–600 (6th Cir. 2005). We agree that "access" in the context of the purchase of a local telephone service is limited to direct connectivity to a specific local telephone system. Interpreting "access" to cover indirect connections would mean, for example, that a toll or long-distance telephone service, which provides indirect access to every local telephone system, would also be considered a local telephone service. This would collapse the separate definitions of "local telephone service" and "toll telephone service" under the statute. *See id.* (noting that contrary interpretation would "blur[] the line between" sections 4252(a) and 4252(b)); *accord Reese Bros., Inc. v. United States*, 447 F.3d 229, 240–41 (3d Cir. 2006); *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1338 (11th Cir. 2005) (noting that a contrary interpretation would make "the entire United States . . . part of one 'local telephone system'" (other internal quotation marks omitted)); *Am. Online, Inc. v. United States*, 64 Fed. Cl. 571, 582 (2005). Similarly, the *USA Choice II* court suggested that a service like Vonage, whose Voice over Internet Protocol ("VoIP") technology "uses the internet to transmit telephone signals, rather than using the traditional public switched telephone network," does not provide direct "access" to a local telephone system. *USA Choice II*, 522 F.3d at 1343 (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1298 (Fed Cir. 2007)).

With this understanding of "access" in mind, we conclude that COBRA provided WorldCom with access to a local telephone system. The connection between a dial-up user and

11

WorldCom through COBRA began with a local telephone customer's ordinary PSTN line. When the subscriber dialed the COBRA number, the telephone company routed the signal from the subscriber's modem and PSTN line to COBRA's PRI lines, which connected to WorldCom's network through the telephone company's network access server. Thus, COBRA provided direct "connectivity" to a local telephone system. Moreover, the record demonstrates that COBRA was a service provided by *individual* local telephone companies. WorldCom contracted separately with each local telephone company, like BellSouth, to gain access to that company's local telephone system. COBRA did not transform the "entire United States [into] . . . one 'local telephone system.'" *Am. Bankers Ins. Grp.*, 408 F.3d at 1338. The access element is satisfied.

B.     The privilege of telephonic quality communication

With access defined, we turn to the second—and more hotly contested—element of local telephone service: whether COBRA provided WorldCom with "the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." 26 U.S.C. § 4252(a)(1). The IRS contends that COBRA did so by connecting dial-up users to WorldCom's network through modems and telephonic PRI lines, just like the similar dial-up Internet services that were found taxable by the Federal Circuit in *USA Choice II* and the Court of Federal Claims in *Comcation*. The Debtors respond that, unlike the services at issue in *USA Choice II* and *Comcation*, WorldCom had access only to the Internet data stream from the telephone company's network access server. Without the ability to use or reconfigure COBRA to talk to the dial-up users on the phone, they argue, COBRA did not provide "the privilege of telephonic quality communication."

We must therefore define "telephonic quality communication." Starting with

12

"telephonic," dictionaries contemporaneous to the enactment of the last substantive revision to the relevant statutory provision define "telephonic" as "[o]f, pertaining to, of the nature of, or conveyed by a telephone." 2 The Compact Edition of the Oxford English Dictionary 3252 (1971); *accord* Webster's New Collegiate Dictionary 873 (1961) (adjective form of "telephone," defined as, *inter alia*, "[t]o send or communicate by telephone"); *see also Taniguchi*, 132 S. Ct. at 2002–03 & n.2 (interpreting "ordinary meaning" of statutory term with reference to contemporaneous dictionaries).

Next, because section 4252 uses the term "telephonic *quality* communication," 26 U.S.C. § 4252(a)(1) (emphasis added), we must determine how "quality" modifies "telephonic." Like the statute's use of the word "access," general dictionary definitions of "quality" shed little light on Congress's intent. *See USA Choice II*, 522 F.3d at 1337. Quality can mean: an attribute, property, special feature, or characteristic; nature, kind, or character; the degree or grade of excellence; or a particular class, kind, or grade of anything, as determined by its quality. 2 The Compact Edition of the Oxford English Dictionary 2383; Webster's New Collegiate Dictionary 691. The meaning of the word depends on context and connotation.

However, "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Here, comparing the definition of "local telephone service" to the related provision of section 4252 defining "toll [long-distance] telephone service" shows that we must give meaning to the word "quality" independent of "telephonic." Section 4252(b) sets forth two alternative definitions of toll telephone service, one that uses the term "telephonic

13

quality communication," and another that refers to a service that provides the customer with the "privilege of an unlimited number of telephonic communications," unmodified by the word quality. *Compare* 26 U.S.C. § 4252(b)(1) (defining toll telephone service as, in relevant part, "a telephonic *quality* communication" (emphasis added)), *with id.* § 4252(b)(2) (alternatively defining toll telephone service as "service which entitles the subscriber . . . to the privilege of an unlimited number of *telephonic communications*" (emphasis added)).[6] Because Congress has distinguished between a service that provides the privilege of "telephonic communications" and "telephonic quality communication," we cannot treat "telephonic quality" as equivalent to "telephonic." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are . . . reluctant to treat statutory terms as surplusage in any setting." (internal quotation marks and brackets omitted)).

If we define "quality" in the context of "telephonic quality communication" as meaning an "attribute, property, or characteristic," we would make "quality" redundant with "telephonic." Saying that a communication that has the "property" or "characteristic" of being telephonic is no different from simply calling a communication telephonic. *See also* 2 The Compact Edition of the Oxford English Dictionary 3252 (defining "telephonic" in part with "of the nature of"). On the other hand, applying the alternate dictionary definitions of "quality" as meaning "the degree or grade of excellence" or "a particular class, kind or grade of anything, as determined by its quality," gives meaning to "quality" by broadening the scope of telephonic communications to those communications in the same "class, kind or grade" as a communication by telephone.

---

[6] Congress enacted these two definitions of toll telephone service in 1965 to reflect the two ways that AT&T—the country's only long-distance telephone provider at the time—billed customers for long distance service. *OfficeMax*, 428 F.3d at 590; *see also* H.R. Rep. No. 89-433, at 30 (1965); S. Rep. No. 89-324, at 35 (1965).

We therefore conclude that quality, as used in this statute, refers to the technological capacity of the channel to transmit voice signals, regardless of whether or not the channel is used for voice communication. If the "grade" of the communication is one that is of the same level as a telephonic communication, then the communication is telephonic quality. In other words, a telephonic quality communication is a communication that is carried over a communication channel that could also carry an ordinary telephone call.[7]

Our interpretation not only gives substance to the word "quality," but is also supported by another provision of section 4252. "The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." *Auburn*, 277 F.3d at 144 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). In addition to taxing local and toll telephone services, the tax code also imposes the communications excise tax on "teletypewriter exchange service." 26 U.S.C. § 4251. Teletypewriter exchange services—now, like COBRA, obsolete—did not provide voice communication; they were an early form of data exchange that connected printers to a network for the purpose of sending *text*-based messages. *See* 28 The New Encyclopædia Britannica 475 (15th ed. 2002); *see also* 26 U.S.C. § 4252(c) (defining as "access from a

---

[7] This definition also appears to be in accord with industry usage of the term "telephonic quality." *See Taniguchi*, 132 S. Ct. at 2005 (relying on "technical" definition as supporting "ordinary" statutory interpretation). In *USA Choice I*, the Court of Federal Claims noted that "[w]hen using the term 'telephonic quality,' the government's expert used 'what [he] believe[d] would be the industry understood definition[, that is] a communication channel over which it [i]s possible to have a two-way conversation with the use of telephones.'" *USA Choice Internet Servs., LLC v. United States* (*USA Choice I*), 73 Fed. Cl. 780, 783 n.7 (2006) (all but first brackets in original), *aff'd*, 522 F.3d at 1341 n.2; *accord WorldCom III*, 449 B.R. at 661 & n.9.

15

teletypewriter or other data station").

After defining what a "teletypewriter exchange service" is, section 4252(c) notes that "[t]he term 'teletypewriter exchange service' does not include any service which is 'local telephone service' as defined in subsection (a)." 26 U.S.C. § 4252(c). By adding this provision to the definition of teletypewriter exchange service, it is clear that Congress envisioned the possibility that a text-based teletypewriter service could also qualify as a local telephone service, even absent the provision of any voice communication. Otherwise, there would be no need to clarify that a service cannot be treated as both a "teletypewriter exchange service" and "local telephone service." To hold that "telephonic quality communication" means only voice communication would render this provision surplusage.

From this, we conclude that a data communication transmitted by a modem is a telephonic quality communication. In this case, both the government's witness and the Debtors' witness agreed that modems transmit data from a computer over telephone lines using the "the same exact [frequency] range" as the human voice, J. App'x 493; *accord id.* at 506. The Debtors' expert also agreed that a modem connection "requires a telephonic quality grade telephone line." *Id.* at 496. Indeed, both the district court and bankruptcy court found that the parties agreed that up until the modem signal reached the network access server there existed "telephonic quality communication." *WorldCom IV*, 2011 WL 6434007, at *6; *WorldCom III*, 449 B.R. at 658. Similarly, the Federal Circuit in *USA Choice II* noted that "a successful connection between one of USA Choice's server modems and another subscriber's modem required telephonic quality." *USA Choice II*, 522 F.3d at 1341. And in *Comcation*, the Court of Federal Claims explained that, "once a call was established [to Comcation's network] on the PRI

16

lines, two-way, telephonic-quality communication occurred," because information from the subscriber and the Internet "flowed back and forth over these [PRI] lines." *Comcation*, 78 Fed. Cl. at 66 (rejecting argument that ISP did not have "privilege" to "communicate with" local telephone customers because ISP could not initiate calls).

We recognize, however, that there is one authority that may be contrary to our interpretation. In a revenue ruling from 1979, the IRS was asked to evaluate whether a data processing and transmission service that used modems and local telephone lines was taxable, and whether the equipment provided to the business in connection with that service was likewise taxable. *See* Rev. Rul. 79-245, 1979-2 C.B. 380. Although the IRS found that the service could be taxed as a "local telephone service" under section 4252(a)(1), it determined that the modems and computer equipment provided to the business were not taxable as facilities provided in connection with that service under section 4252(a)(2). *Id.* The IRS concluded that because "the type of telephone signal produced by . . . modems is usable only for nonvoice data transmission to other computer station," and because "only a relatively few stations in [the local] telephone system are used in this computer service," "a modem is not a facility provided in connection with the privilege of telephonic quality communication with substantially all persons having stations in the local system." *Id.*[8]

---

[8] Although we acknowledge this potential conflict, the IRS cites Revenue Ruling 79-245 in this case only to point out that the communications service there was deemed taxable. *See* Appellant's Reply Br. 15. It does not at all discuss the portion of the revenue ruling that undercuts the position it takes here. The IRS simply assumes the definition given to telephonic quality by the Federal Circuit in *USA Choice II* is correct and urges us to adopt it. *See* Appellant's Br. 29–30. For their part, the Debtors never discuss Revenue Ruling 79-245. Nevertheless, because statutory interpretation is a "holistic endeavor," we address the potentially contrary authority here. *See United Sav. Ass'n of Tex.*, 484 U.S. at 371.

17

It is not clear whether the IRS reached this conclusion primarily because the service provided access to only a limited number of stations, or because "nonvoice data transmission" was not of telephonic quality. In the end, the IRS found the service taxable because the business could choose to plug a regular telephone instead of a modem into the port for the service, thereby affording it the privilege of telephonic quality communication, "even though [it] may not be exercised." *Id.*; *accord USA Choice II*, 522 F.3d at 1341–42. Although not altogether certain, the strong implication of the IRS's reasoning, however, is that computer-to-computer communications over telephone wires are not "telephonic quality communication." *See WorldCom III*, 449 B.R. at 661 (interpreting Revenue Ruling 79-245 as "equating telephonic quality communication with voice communication" (emphasis omitted)).

We do not think this revenue ruling overcomes the text of the statute. The deference owed to IRS revenue rulings is presently an unsettled area of law. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (declining to decide whether revenue rulings are entitled to *Chevron* deference). Prior to the Supreme Court's opinion in *United States v. Mead Corp.*, 533 U.S. 218 (2001), we afforded "great deference" to IRS revenue rulings, and explained that they are "presumed to have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code." *Weisbart v. U.S. Dep't of Treasury*, 222 F.3d 93, 98 (2d Cir. 2000) (internal quotation marks omitted). We have recognized, however, that this standard was potentially undermined by the Supreme Court's holding in *Mead* that administrative rulings are not entitled to deference unless they carry the "force of law." *See Reimels v. Comm'r*, 436 F.3d 344, 347 n.2 (2d Cir. 2006); *see also Fortis, Inc. v. United States*, 420 F. Supp. 2d 166, 178–79 (S.D.N.Y. 2004). We now hold, consistent with every other circuit

18

to have addressed the issue since *Mead*, that revenue rulings are not entitled to *Chevron* deference. *See, e.g.*, *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 454 & n.9 (5th Cir. 2008); *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003); *Omohundro v. United States*, 300 F.3d 1065, 1067–68 (9th Cir. 2002); *Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001).

"[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. But, "[u]nlike treasury regulations, the IRS does not invoke its authority to make rules with the force of law when promulgating revenue rulings." *Kornman*, 527 F.3d at 454 (citing 26 C.F.R. § 601.601(d)(2)(v)(d)). Even though a revenue ruling is the "official IRS position on application of tax law to specific facts," *Weisbart*, 222 F.3d at 98 (internal quotation marks omitted), the Supreme Court has made clear that official agency interpretations lacking the force of law are not entitled to *Chevron* deference. *See Mead*, 533 U.S. at 233–34 (holding tariff rulings are not entitled to *Chevron* deference); *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (holding agency opinion letters are not entitled to *Chevron* deference). As we previously implied in *Reimels*, *Weisbart* has been abrogated by *Mead*.

Although not entitled to *Chevron* deference, particular revenue rulings may be given deference to the extent that they are persuasive—in other words, we will afford them *Skidmore* deference. *See Mead*, 533 U.S. at 234–35 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)); *accord WorldCom I*, 371 B.R. at 30–32 (rejecting *Chevron* deference and evaluating

19

whether revenue rulings are entitled to deference under *Skidmore*). "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140). As relevant here, we do not defer to Revenue Ruling 79-245 under *Skidmore* because we do not find it persuasive.

The IRS's one-page legal analysis makes no effort to interpret the word "quality." Nor does it attempt to square "telephonic quality communication" in the local telephone service definition with either "telephonic communications" in the toll telephone service definition or the teletypewriter definition's exclusivity rule. The ruling "contains no analysis of text or legislative history or any other relevant interpretive guidance." *Fed. Nat'l Mortg. Ass'n v. United States*, 379 F.3d 1303, 1308 (Fed. Cir. 2004). Similarly, the ruling "neither elucidates nor invokes support for its conclusion" that modems do not qualify as conveying telephonic quality communication. *Id.* By contrast, other courts that have squarely addressed the issue of whether dial-up Internet services similar to COBRA are taxable have concluded that modems *do* engage in telephonic quality communication by communicating over telephone lines. *See USA Choice II*, 522 F.3d at 1334, 1341; *Comcation*, 78 Fed. Cl. at 64. We therefore give Revenue Ruling 79-245 no weight, in accord with our sister circuits that have declined to defer to similarly cursory revenue rulings. *See Fed. Nat'l Mortg. Ass'n*, 379 F.3d at 1308–09; *O'Shaughnessy v. Comm'r*, 332 F.3d 1125, 1130–31 (8th Cir. 2003).[9]

---

[9] We likewise reject any potential argument that we should defer to Revenue Ruling 79-245 pursuant to the "legislative re-enactment doctrine," which presumes that Congress is "aware of an administrative or judicial interpretation of a statute and . . . adopt[s] that

To be of telephonic quality a communication must use "a communication channel over which it is possible to have a two-way conversation with the use of telephones," *USA Choice II*, 522 F.3d at 1341 n.2 (alteration omitted). The local telephone and PRI lines used by modems are such a channel. Therefore, data communication through a modem over telephone lines is "telephonic quality communication."

Now that we have defined the "privilege of telephonic quality communication," we must decide if COBRA provides it. The IRS argues that by routing a dial-up user's modem signal over PRI lines that were capable of carrying a phone call, COBRA provided WorldCom with the privilege of telephonic quality communication. But the Debtors claim that because COBRA transformed that modem signal into an Internet-compatible, non-voice quality TCP/IP data stream within the network access server, and because WorldCom had access to only the data stream, COBRA did not provide the privilege of telephonic quality communication. The Debtors contend that "all [the] requirements [of section 4252(a)] . . . must extend through the *entirety* of the connection. It is not sufficient that a portion of the path contains one of these elements." Appellee's Br. 24 (emphasis added).

Despite the certainty of the Debtors' assertion, they cite no portion of the statute, nor any relevant case law, that supports such an interpretation. The plain language of section 4252(a)'s phrase "the privilege of telephonic quality communication" does not answer whether the service purchased has to provide the privilege of telephonic quality communication throughout the

---

interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (citations omitted). There is no evidence that this particular revenue ruling has been "fully brought to the attention of the public and the Congress," in a way that justifies invoking the doctrine. *Am. Bankers Ins. Grp.*, 408 F.3d at 1335–36 (holding doctrine not applicable to revenue ruling on long-distance phone calls in interpreting communications excise tax).

*entirety* of the service's system, or if it is sufficient if only a *portion* of the system provides that privilege. We have fallen into a statutory crevice. To fill it, we look beyond the plain text of the statute. *In re Boodrow*, 126 F.3d 43, 49 (2d Cir. 1997) ("'[T]he text is only the starting point,' especially when the language is ambiguous." (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986))).

But before we do so, we address the government's contention that we do not need to look beyond the plain text because COBRA is clearly taxable when section 4252(a) is read in conjunction with another provision of the communications excise tax statute, section 4254(a). Section 4254(a) sets out the general rule for calculating the excise tax, which is that "[i]f a bill is rendered the taxpayer for local telephone service or toll telephone service[,] . . . the amount on which the tax with respect to such services shall be based shall be the sum of all charges for such services included in the bill." 26 U.S.C. § 4254(a). Because the modem connection between the dial-up users and the network access server is of "telephonic quality" and has been previously held to be taxable by *USA Choice II* and *Comcation,* the IRS argues that COBRA simply provides the same "service" plus a network access server, and that the whole charge is therefore taxable.

We disagree for several reasons. First, we think the IRS misreads the applicability of *USA Choice II* and *Comcation*. The IRS contends that because those courts found similar services taxable, we can shoehorn COBRA into that finding as providing a little "more." But this mistakes the holdings of *USA Choice II* and *Comcation* for agreement with the IRS's reasoning. Those courts did not address the issue of whether the "service" changes when the customer does not have access to the PRI lines. *See USA Choice II*, 522 F.3d at 1341 ("USA Choice's decision

22

to connect these lines to modems in its network servers rather than to telephones through equipment such as a multiplexor or PBX[—]though perfectly understandable for a commercial ISP—resulted in self-imposed limits that did not fundamentally alter the nature of the services that USA Choice had the privilege to use." (internal quotation marks, citation, and brackets omitted)).  Looking, as we must, at the text, it would be entirely circular to use section 4254(a)'s explanation of how to calculate the tax assessed on a local telephone service to define what a local telephone service is.  The IRS's argument works only if we already assume that the section of COBRA that uses PRI lines is a taxable "local telephone service," and therefore fails.

Although the plain text of the statute does not answer whether a service must provide "telephonic quality communication" throughout the entirety of the system in order to be taxable, "Congress passes legislation with specific purposes in mind.  When the ordinary tools of statutory construction permit us to do so, we must attempt to discover those purposes . . . ." *N.Y.C. Health & Hosps. Corp. v. Perales*, 954 F.2d 854, 862 (2d Cir. 1992).  Keeping in mind that "[s]tatutory construction . . . is a holistic endeavor," *United Sav. Ass'n of Tex.*, 484 U.S. at 371, we may "look at legislative history to determine the intent of Congress," *Auburn*, 277 F.3d at 143–44.

The history of the communications excise tax is long and turbulent.  Congress first imposed a tax on the purchase of communications services shortly after the Spanish-American War, twenty years after the invention of the telephone.  *See OfficeMax*, 428 F.3d at 585–86 (tracing legislative iterations of the tax).  Although initially designed as a temporary tax passed to finance the deficit caused by the War, Congress repeatedly reenacted and extended the tax, adjusting the scope of its coverage and changing the rates applicable to various services, before

23

making the tax permanent at its current rate of three percent in 1990 for all services covered. *Id.* (noting that attempt to repeal the tax in 2000 was vetoed by President Clinton).

The most recent substantive change to the definitions of taxable services occurred in 1965, when Congress enacted the Excise Tax Reduction Act of 1965, Pub. L. No. 89-44 § 302, 79 Stat. 136, 145. *See Am. Online*, 64 Fed. Cl. at 578. As is most relevant here, the 1965 Act enacted the current definitions of local telephone service, toll telephone service, and teletypewriter exchange service. *See Trans-Lux Corp.*, 696 F.2d at 967. The definitions were "likely . . . updated and modified in order to reflect and to meet the changing technology and market conditions of the industry . . . [,] in order 'to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied.'" *Id.* (quoting H.R. Rep. No. 89-433, at 30 (1965); S. Rep. No. 89-324, at 35 (1965)).[10] This history suggests that Congress intended to tax any communication service as a "local telephone service" so long as it connected a customer to a local telephone system and allowed that customer to use the telephone lines to communicate with the subscribers to that system, regardless of whether the service also used non-telephonic equipment to accomplish that communication.

Although the bankruptcy and district courts acknowledged this congressional purpose, they misapplied it when evaluating the service that COBRA provided. By focusing solely on the part of the COBRA system that WorldCom connected to and had control over—the data stream

_____

[10] The prior version of the statute, enacted in 1958, defined "general telephone service" as "any telephone or radio telephone service furnished in connection with any fixed or mobile telephone or radio telephone station which may be connected (directly or indirectly) to an exchange operated by a person engaged in the business of furnishing communication service." Excise Tax Technical Changes Act of 1958, Pub. L. No. 85-859 § 133, 72 Stat. 1275, 1290. The 1965 amendments broadened this definition to "telephonic quality communication," unmooring the statute from any particular equipment configuration.

24

that came out of the egress to the network access server—the bankruptcy and district courts did not apprehend the scope of the service the local telephone companies sold to WorldCom. The COBRA service was not just a "data stream," sitting on a shelf to be picked up by any telecom shopper looking for Internet access. Such a conclusion gives too much emphasis to the equipment used by the local telephone companies—the network access server—and ignores the system as a whole.

What COBRA provided, as made clear by the bankruptcy court's factual findings, was a communication *pathway* between local telephone customers and WorldCom's network. COBRA allowed WorldCom to connect dial-up modem users to the Internet through those users' regular telephone lines. And in order to connect them to the Internet, the part of that pathway that used modems required telephonic quality communication.

That WorldCom connected its equipment to the COBRA system only after the local telephone company converted the modem signals to a high-speed data stream does not change the fact that the service relied on modem signals being carried over PRI lines that afforded telephonic quality communication. Without PRI lines there would be no COBRA service and nothing for WorldCom to resell to the ISPs. As other courts have noted, the statutory definition of local telephone service shows that Congress intended to tax those users who rely on the traditional telephone system for whatever reason. *See USA Choice II*, 522 F.3d at 1341 (noting the tax applies to customers who use their phone lines, regardless of whether to make phone calls or to plug in a fax machine). Accordingly, because COBRA relied on telephonic quality PRI lines to allow WorldCom's network to communicate with dial-up subscribers, COBRA provided WorldCom with the "privilege of telephonic quality communication."

25

The Debtors, relying on the same legislative history from 1965 that emphasizes the "shift [of] the focus of the tax to the services rather than the equipment being provided." *USA Choice II*, 522 F.3d at 1339; *see* H.R. Rep. No. 89-433, at 30, argue that the PRI lines were merely part of the local telephone company's COBRA equipment and not part of the actual service provided to WorldCom. We disagree. First, the bankruptcy court found that one of the "COBRA system['s]. . . three basic components" was routing "dial-up connections . . . from [the telephone company's central office] switches to the COBRA system through ingress Primary Rate Interface ('PRI') lines." *WorldCom I*, 371 B.R. at 24. Indeed, on remand from the district court, the Debtors' proposed findings of fact stated that the PRI lines were "used by the [telephone companies] as part of their provision of COBRA service." J. App'x 1391–92; *see also WorldCom III*, 449 B.R. at 662 (referring to PRI lines as "part of the COBRA service"). Second, the Debtors' expert witness and employee, John Anderson, testified that the PRI lines were a component of the COBRA service purchased by WorldCom. Third, WorldCom's contracts with local telephone companies listed the PRI lines as part of the COBRA service.

To give a more intuitive example (though perhaps dated for some), consider a fax machine. Fax machines transmit data signals over ordinary telephone lines. When a person pushes "start" on a fax machine, the machine scans the piece of paper, converts the image into a signal, and transmits it over a telephone line to the number dialed. The fax machine on the other end of the call receives the signal, converts the signal back into the image originally scanned, and prints a copy. Given that we have defined "telephonic quality" as meaning any communication that relies on a telephonic-grade connection, a fax connection is of telephonic quality. But the connection over the telephone lines is not the only thing the fax machine relies on to

communicate. To finish the communication, the fax machine converts the signal into a printed image. The piece of paper printed is certainly not of "telephonic quality."

Accepting the Debtors' argument that the connection must remain of telephonic quality through the entirety of the connection, a service that connects fax machines over the local telephone system would not be taxable. We would have to conclude that only the printer/scanner part of the fax machine that the customer uses is the "service," and that the telephone lines used by the machines are merely "equipment." But if that is the case, what, other than an ordinary telephone call, could be taxable as a telephonic quality communication? Such an interpretation would bring us back to treating "telephonic quality communication" in sections 4252(a)(1) and (b)(1) as equivalent to "telephonic communications" in subsection (b)(2). We do not think that Congress intended the taxability of a "local telephone service" to turn on whether a service that allows a customer to communicate using a telephonic quality connection adds additional services or equipment beyond that connection.

Moreover, to hold that COBRA did not provide the privilege of telephonic quality communication would create a strange result where telecommunication companies that used their own network access servers to convert a phone signal to a data stream, like USA Choice and Comcation, would have to pay the tax, but companies that relied on the local telephone company to convert the signals for them, like WorldCom, would not. This appears at odds with the statute's intent for two reasons. First, whether a service is taxable would hinge on what equipment the local telephone company provided, not the nature of the service. *See* S. Rep. No. 89-324, at 35; H.R. Rep. No. 89-433, at 30.

Second, when Congress enacted the 1965 Act it added the "private communications

27

service" exemption to the tax to avoid such a discrepancy in another context. *See* 26 U.S.C. § 4252(d). As the Federal Circuit explained:

> Congress enacted the private communication services exemption in order to correct the competitive imbalance that had developed between telephone company-furnished services and subscriber-owned equipment. Under the 1958 Excise Tax Technical Changes Act, a subscriber to the telephone company's Centrex or PBX systems (communication systems that allowed both intrapremise and interpremise communication) was subjected to the federal excise tax on his entire payment to the telephone company for service and equipment. But if the subscriber purchased its intercom equipment outright from a communications equipment manufacturer, the equipment was free of the federal excise tax. Because the telephone companies were losing business to companies that provided telephone and microwave equipment that could be purchased and operated by the users themselves, Congress created an exemption to the excise tax on local telephone service.

*Trans-Lux Corp.*, 696 F.2d at 967 (citations omitted); *accord W. Elec. Co. v. United States*, 564 F.2d 53, 57 (Ct. Cl. 1977) (en banc); H.R. Rep. No. 89-433, at 30–31 (noting inequity of taxing intercom services where telephone company owned equipment but not taxing substantially identical service where subscriber owned equipment). The Debtors' argument would create a similar inequity here, despite the identical purpose and function of the systems, regardless of ownership.

The Debtors also urge us to rely on the canon of statutory interpretation that any doubt as to taxability should be resolved in favor of the taxpayer. That canon's validity has been called into question by both the Supreme Court and this Court. *White v. United States*, 305 U.S. 281, 292 (1938) ("We are not impressed by the argument that, as the question here decided is doubtful, all doubts should be resolved in favor of the taxpayer."); *Wolder v. Comm'r*, 493 F.2d 608, 611 n.4 (2d Cir. 1974). Because the other traditional tools of statutory interpretation lead us to conclude that COBRA is taxable, we decline to rely on the canon here. *See Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) ("[C]anons are not mandatory rules. They are guides

that need not be conclusive." (internal quotation marks omitted)).

It is somewhat odd to fit Internet technology into a statutory definition that has not been updated since the Mad Men era. Although Congress frequently revised the communications excise tax in the first half of the twentieth century to account for changing technology, the 1965 Act was intended to be the last iteration of the tax before it was phased out entirely by 1969. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1333. In light of this history, courts have refused to rewrite the definition of "toll telephone service" to account for changes in how telephone companies charge for long distance service. *See, e.g.*, *id.* ("[I]f the statutory language no longer fits the infrastructure of the industry, the IRS needs to ask for congressional action to bring the statute in line with today's reality. It cannot create an ambiguity that does not exist or misinterpret the plain meaning of statutory language to bend an old law toward a new direction." (quoting *Am. Online*, 64 Fed. Cl. at 578)).

But although congressional clarity would make our inquiry easier, we cannot simply say the statute is "too old" and decline to apply it to this newer technology. The reasoning in *American Bankers* does not foreclose us from using the purpose of the statute to resolve an ambiguity; it simply cautions us not create one where the language is clear. Unlike the toll telephone service cases, there is an ambiguity in the definition of "local telephone service" that we must address. And in interpreting Congress's purpose at the time the statute was passed, we find that the "privilege of telephonic quality communication" element of local telephone service covers any service that makes use of the traditional telephone network for communication, regardless of the form of the communication or whether the service also uses non-telephonic technology to accomplish that communication. COBRA provided this privilege.

C.  Communication with substantially all persons constituting a part of such local telephone system

The district court also found in the alternative that because COBRA was merely an "intermediate" step in connecting to the Internet, WorldCom could not use COBRA to communicate with "substantially all persons" in the local telephone system. *See* 26 U.S.C. § 4252(a)(1) (requiring "the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system"). The COBRA system, in the district court's view, was its own cocooned network, set off from the local telephone system that the dial-up subscribers used. *See WorldCom IV*, 2011 WL 6434007, at *7 (holding the only communication within COBRA was "with and between the equipment within the [telephone company's] switch and [the network access server]"). We disagree with the district court's interpretation of this element of section 4252(a) and its application to COBRA.

The portion of the statute that requires communication with "substantially all persons" in a local telephone system is part of the "privilege" element of the definition—meaning that it focuses on the capacity of the purchaser to communicate with "substantially all persons," not whether the purchaser actually does so. *See USA Choice II*, 522 F.3d at 1341–42 (holding ISP's decision to impose a password requirement for connecting to its servers did not deprive it of the privilege to communicate with "substantially all persons" in the local telephone system). The district court reasoned that because WorldCom's network was only an intermediate step to the Internet that connected dial-up users to ISPs, WorldCom could not "communicate" with the dial-up users "as an intermediary sitting between any relationship of the end users and the [local telephone companies] and ISPs." *WorldCom IV*, 2011 WL 6434007, at *7. The district court

relied on the fact that in *USA Choice II*, "the suit was between the ISP and the I.R.S. The ISP was not playing simply an intermediary role as the Debtors are here." *Id.* at *5 n.3. According to the district court, WorldCom's intermediary role is "a critical distinguishing factor between the COBRA service and the services at issue in [*USA Choice II* and *Comcation*]." *Id.* at *5.

But this ignores that WorldCom *chose* to resell the COBRA data stream to the ISPs. *See WorldCom I*, 371 B.R. at 23–24 & n.1 (describing various WorldCom Internet networks, and explaining that WorldCom used COBRA to resell access to smaller regional ISPs). The Debtors cite nothing that prevented WorldCom from acting as an ISP. The district court's reasoning falls apart for substantially the same reasons as did the arguments in *USA Choice II* and *Comcation*: it "ignore[s] evidence that these . . . restrictions relate solely to . . . self-imposed limitations." *USA Choice II*, 522 F.3d at 1341; *accord Comcation*, 78 Fed. Cl. at 65.

The district court also characterized COBRA as a self-contained service, and concluded that "[t]here is no way for 'substantially all persons' within this service to access whatever telephonic quality communication the [COBRA] PRI lines support." *WorldCom IV*, 2011 WL 6434007, at *7. But this reasoning conflates the term "local telephone *service*" under section 4252(a) with the elements of section 4252(a), specifically "access" to a "local telephone *system*" and communication with "substantially all persons" in that "local telephone *system*." COBRA provided "the privilege of telephonic quality communication with substantially all persons" in the local telephone system because all of the local telephone company's customers could call the COBRA number and could communicate with WorldCom's network through the use of a modem. Because COBRA connected WorldCom to the local telephone system, it provided WorldCom with "access" to that system. And because it allowed any dial-up user within that

31

system to call the COBRA number and communicate with WorldCom's network, it also provided the privilege of telephonic quality communication with "substantially all persons" within that local telephone system. This is all the statute requires; the "local telephone service" and the "local telephone system" do not have to be one and the same.

II.    *Private Communications Service*

Finally, although not addressed by either the bankruptcy or district courts, the Debtors argue that we can affirm the judgment on the alternative ground that COBRA was exempt from taxation as a "private communication service" pursuant to 26 U.S.C. § 4252(d)(1). *See ACEquip Ltd. v. Am. Eng'g Corp.*, 315 F.3d 151, 155 (2d Cir. 2003) (noting that we may affirm on any ground appearing in the record). A private communication service is defined in relevant part as:

> (1) the communication service furnished to a subscriber which entitles the subscriber—
>
> (A) to exclusive or priority use of any communication channel or groups of channels, . . . regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a [local telephone service],
>
> . . . except that such term does not include any communication service unless a separate charge is made for such service.

26 U.S.C. § 4252(d). The Debtors contend that WorldCom had exclusive use of the data stream leading from the network access server to WorldCom's network. WorldCom paid separately for COBRA service; this payment was not comingled with any other service. Therefore, according to the Debtors, WorldCom purchased a private communication service akin to an exclusive intercom system, which the Court of Claims has held to be non-taxable. *See W. Elec. Co.*, 564 F.2d at 66.

This argument is meritless. First, we do not think that COBRA constitutes a distinct "communications service" that is separate from the local telephone system. *See USA Choice II*,

522 F.3d at 1344 (holding exception "requires that the system at issue provide a 'communication service' beyond that of mere local telephone service, not just connectivity to the local telephone system *itself*," and finding that PRI lines are not a service separate from the local telephone system); *accord Comcation*, 78 Fed. Cl. at 73–75; *see also* H.R. Rep. No. 89-433, at 31 ("Centrex systems—where the switching equipment is generally on the premises of the local exchange rather than on that of the subscriber—generally do not . . . provide for a charge which is separate and distinct from that for the local telephone service."); *accord* S. Rep. No. 89-324, at 35. Second, even assuming COBRA were a separate communications service, the Debtors cannot show that WorldCom was entitled to "exclusive or priority" use of the channel. Anyone connected to the public telephone network could dial in to utilize COBRA's dedicated PRI lines (and connect to the Internet). *See USA Choice II*, 522 F.3d at 1346. *But see id.* at 1347–48 (Dyk, *J.*, concurring in part and dissenting in part) (arguing that USA Choice did have exclusive or priority use, but agreeing that service was not a distinct "communication service"). The exception does not apply.

## CONCLUSION

Accordingly, the judgment of the district court is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this Opinion.